James Mack, Individually, and as                    *       IN THE CIRCUIT
Surviving Parent and Personal Representative
of the Estate of Crystal Ann Mack
 4 Bridgeton Court
Owings Mills, Maryland 21117                        *       COURT FOR

and

Sylvia Mack                                         *       BALTIMORE CITY
Surviving Parent of Crystal Ann Mack
 4 Bridgeton Court
Owings Mills, Maryland 21117

        Plaintiffs,

v.                                                          Case Number 24-C-08-000994

Amerisourcebergen Drug Corporation                  *
P.O. Box 959
Valley Forge, PA 19482

Corporate Headquarters
1300 Morris Drive Suite 100                                RDB 08CV0688
Chesterbrook, PA 19087

dba Amerisource Bergen
 401 E. Pratt Street                                *
Baltimore, Maryland 21202

    Serve on:

Resident Agent:
The Corporation Trust Incorporated
300 E. Lombard Street                               *
Baltimore, Maryland 21202

and

Johnson & Johnson
I.R.S. Employer 22-1024240
One Johnson & Johnson Plaza                         *
New Brunswick, New Jersey 08933

    Serve on:

W. C. Weldon

                                                                                    1

Chairman, Board of Directors,
Chief Executive Officer, and Director
(Principal Executive Officer)
One Johnson & Johnson Plaza
New Brunswick, New Jersey 08933          *

and

Centocor, Inc.
200 Great Valley Parkway
Malvern, PA 19355

   Serve on:

David P. Holveck                          *
Centocor, Inc.
200 Great Valley Parkway
Malvern, Pennsylvania 19355,

    Defendants.



RECEIVED
FEB 27 2008
T.B. Van Itallie, Jr.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### FIRST AMENDED COMPLAINT

    James Mack, Individually, and as Surviving Parent and Personal Representative of the

Estate of Crystal Ann Mack, and Sylvia Mack, Surviving Parent of Crystal Ann Mack,

Plaintiffs, by the undersigned attorneys, Donald R. Huskey and Governor E. Jackson,

III, sues Amerisourcebergen Drug Corporation dba Amerisource Bergen, Johnson &

Johnson, and Centocor, Inc., and files this first amended complaint and states:

### PARTIES

1.   Crystal Ann Mack (herein after referred to as Crystal Mack, unless otherwise

    stated) died on April 17, 2007 at the age of 26. She was a resident of Baltimore

    County, Maryland at the time of her death and resided at 4 Bridgeton Court,

    Owings Mills, Maryland 21117. She was a Medicaid patient with member

number 44900832200 effective 01/01/2006. The Medicaid benefits for Crystal Mack were administrated through her insurance carrier Amerigroup, P.O. Box 61749, Virginia Beach, VA.

2. James Mack, Plaintiff, is Personal Representative of the Estate of Crystal Ann Mack, by virtue of Letters of Administration granted him by the Register of Wills of Baltimore County on May 21st, 2007. As Personal Representative, he is entitled to pursue a survival action on behalf of the estate pursuant to Section 7-401 (y) of the Estate and Trusts Article of the Maryland Annotated Code. James Mack is the surviving parent of Crystal Ann Mack and resides at 4 Bridgeton Court, Owings Mills, Maryland 21117. James Mack, individually, is a parent and the natural father of Crystal Ann Mack. James Mack was verbally advised by his family physician that Remicade® was a safe and effective drug and he requested that Dr. Lisa Pichney, his daughter's gastroenterologist consider prescribing the drug based on this recommendation.

3. Sylvia Mack, Plaintiff, is a surviving parent and the natural parent of Crystal Ann Mack, the decedent. Sylvia Mack resides at 4 Bridgeton Court, Owings Mills, Maryland 21117.

4. James Mack and Sylvia Mack named herein are the primary (and only) beneficiaries entitled to pursue a wrongful death action pursuant to Section 3-901 through 3-904 of the Court and Judicial Proceedings Article of the Maryland Annotated Code.

5. At all times relevant herein the Defendants, Amerisourcebergen Drug Corporation P.O. Box, 959, Valley Forge, PA 19482 with its corporate

headquarters located at 1300 Morris Drive, Suite 100, Chesterbrook, PA 19087

*dba* Amerisource Bergen ("hereafter referred to as Amerisource Bergen unless

otherwise indicated) located and doing business at 401 E. Pratt Street (World

Trade Center), Baltimore, Maryland 21202, were individuals or business entities

whose identities were engaged in, among other things, the selling of

pharmaceutical products within the State of Maryland and/or in other parts of

the country, including Remicade ® (Infliximab). This defendant was the

authorized distributor of Remicade® in Maryland for Defendant Johnson &

Johnson and its pharmaceutical segment Defendant Centocor Inc., at all times

relevant in the complaint. This defendant employed sales persons in Maryland

to verbally communicate that Remicade ® was a safe and effective drug for the

treatment of Crohn's disease.

6. Defendant Johnson & Johnson[1] ("J& J") is a corporation in good standing

organized under the laws of the State of New Jersey. It is located at One

Johnson & Johnson Plaza, New Brunswick, New Jersey 08933.Johnson &

Johnson is incorporated in the State of New Jersey and has an I.R.S. Employer

Identification of 22-1024240. Based on Annual Report (10-K) filed on 12/3/06

the following information was stated concerning this defendant. The executive

officers are W.C. Wilson, Chairman, Board of Directors, Chief Executive

Officer, Director (Principal Executive Officer); R. J. Darretta, Vice Chairman,

---

[1] Given that Johnson & Johnson answered Plaintiffs'' Statement of Claim in Health Claims Alternative Dispute Resolution Office as the entity "Johnson & Johnson, Inc.", this complaint refers to Johnson & Johnson, Johnson & Johnson, Inc. and any and/or all other alter-egos of Johnson & Johnson which were in existence at the time the Complaint was filed. The claim before the Health Care Claims Arbitration Office of the State of Maryland was dismissed on February 11th, 2008 as to Defendants Johnson & Johnson and Centcor's based on the lack of subject matter jurisdiction. The dismissal of these parties occurred after the filing of this lawsuit in the Circuit Court for Baltimore City on February 8, 2008.

Board of Directors, and Director; C.A. Poon, Chief Financial Officer (Principal Officer); D.J. Caruso, Controller (Principal Accounting Officer); M.S. Coleman, Director; J.G. Cullen-Director; and M.M.E. Johns-Director. "Johnson & Johnson and its subsidiaries have approximately 122,200 employees worldwide engaged in the research and development, manufacture and sale of a broad range of products in the health care field. Johnson & Johnson has more than 250 operating companies conducting business in virtually all countries in the world. Johnson & Johnson's primary focus has been on products related to human health and well-being. Johnson & Johnson was incorporated in the State of New Jersey in 1887. The company's structure is based on the principle of decentralized management. The Executive Committee of Johnson & Johnson is the principal management group responsible for the operations and allocation of the resources of the company. This Committee oversees and coordinates the activities of the Consumer, Pharmaceutical and Medical Devices and Diagnostics business segments. Each subsidiary within the business segments is, with some exceptions, managed by citizens of the country where it is located. Johnson & Johnson is organized into three business segments: Consumer, Pharmaceutical and Medical Devices and Diagnostics. **The Pharmaceutical segment includes products in the following therapeutic areas…Key products in the Pharmaceutical segment include…REMICADE® (infliximab), a monoclonal antibody therapy indicated to treat the systems of Crohn's disease, ankylosing, spondylitis, psoriatic arthritis, ulcerative colitis, chronic severe psoriasis and use in the treatment of rheumatoid**

**arthritis…"** Remicade® is the product involved in the instant litigation which is a product that was researched, developed and manufactured by Johnson & Johnson. J&J's Remicade®, through its' pharmaceutical segment Defendant Centocor, and was distributed by Americsourcebergen Drug Corporation *dba* Amerisource Bergen. Defendants J&J and Centocor approved benefits for Remicade® as a marketing tool through contracts with its agents, servants, and employees at Accessone. Accessone- controlled, managed, and operated by Defendant's J&J and Centocor- was a single source support for access to infusion therapy including the company's drug Remicade® as evidenced at website www.centocoraccone. The infusion of Remicade® to Crystal Mack occurred at St. Joseph Medical Center's Seprick Infusion Center on November 16, 2006, November 29, 2006, December 27, 2006, and additional dates as stated in the complaint. St. Joseph Medical Center, through its' Seprick Infusion Center, entered into agreements with Centocor and J&J for operation of the infusion center including the support activities of Accessone. Those activities included advice on the treatment and care of patients receiving Remicade®, the education of patients regarding the drug's use and adverse consequences, the scheduling and reminding patients of appointments, advising on the methods for billing, payments, and reimbursement for use of the product, including establishing that the drug was a "medical necessity." Amerisourcebergen was recognized as a specialty distributor of Remicade® pursuant to contract with J&J and its business segment Centocor. Several business segments of J&J are incorporated in the state of New Jersey including Johnson & Johnson

Pharmaceutical Services LLC with a business address of 700 Route 202 South,
Raritan, N.J. 08869, registered agent, Johnson & Johnson (filing number
600129466); Johnson & Johnson Medical S.A. Inc., registered agent, Johnson &
Johnson; registered office, One Johnson & Johnson Plaza, New Brunswick, NJ
08933-0, (filing number 100841650); and Johnson & Johnson Pharmaceutical
Research & Development L.L., business address, 920 US Route 202, Raritan,
NJ. 08869, registered office, One Johnson & Johnson Plaza, New Brunswick,
N.J. 08933 (filing number 600128798). This defendant employed a sales force
who verbally communicated to physicians and consumers that Remicade ® was
a safe and effective drug.

7. Defendant Centocor, Inc. ("Centocor") is a Pennsylvania corporation in good
standing with its corporate headquarters located at 200 Great Pwky, Malvern,
PA 19355. The company is a business segment of J&J based on the 10-K
federal security filing. Centocor's officers, based on the filing with the
Pennsylvania Secretary of State, are James N. Wood, Vice President; Paul G.
Wulfing, Treasurer; George D. Hobbs, Secretary; and David P. Holveck,
President. Centocor as a J&J segment is in the business of biotechnology and
pharmaceutical development; it manufacturers and markets the drug, Remicade
®. Centocor retained exclusive marketing rights for Remicade in the United
States. Centocor merged with J& J on October 6, 1999, in a $4.9 billion stock
deal. Defendants J&J and Centocor researched, developed, manufactured and
distributed Remicade® to Defendant Amerisourcebergen Drug Company. This
Defendant as an agent, servant, or employee of J&J and Centocor sold and

provided Remicade to defendant St. Joseph Medical Center for infusion into Crystal Mack, who was a user and consumer. Accessone which was the agent, servant, or employee of J&J and Centocor served as "single source support for access to infusion therapy" for Remicade®. Accessone provided the following services by written contract with Defendants J& J and Centocor including but not limited to researching the benefits for Crystal Ann Mack. Accessone verified that her benefits provided coverage for Remicade®. This verification was dated 10/02/06 and faxed to Defendant Lisa Pichney, MD-Medical Director. Centocor and J&J's Accessone agreed in their written correspondence to Dr. Pichney to provide appeals process research, when claims were denied for Remicade®; to research the administrative denial process; to assist with infusion site location; to assist with personalized care coordination including benefits explanation to patients; to assist with appointment reminders and infusion follow-up calls; provide disease state information for all approved indications for Remicade; and to assist with alternative coverage research, for those patients who required coverage or additional coverage for Remicade®. Accessone was a single support system for infusion therapy for Remicade and maintained and still maintains a toll free number and a website location at www.centocoraccesone.com. Additionally, Accessone provided support in supporting that Remicade® was a "medical necessity" for patients who were recommended for Remicade® use by their physicians. These services provided by Accessone were provided to Crystal Ann Mack and other patients with the "cost of the product."  Centocor and J&J passed the direct cost for these

services on to patients when Remicade was prescribed, ordered and infused according to written documents. Accessone further contracted with patients to provide education and follow-up services to them before and after the infusion of Remicade®. In order to participate in the "plan" with Defendants J&J and Centocor through Accessone, Crystal Mack was required to sign a written contract with the Lash Group on September 9, 2006, which stated, "If I refuse to sign this form, I know that this means I may no longer be able to receive assistance from this Program." By agreement expressed and implied Crystal Ann Mack, J&J and Centocor through its agents, servants, or employees of Accessone undertook the obligation to advise Mack of the benefits and risks of Remicade® treatment, although not a health care provider. Crystal Ann Mack detrimentally relied on these representations of Accessone, controlled and operated by Defendants J&J and Centocor.

## JURISDICTION

8.  This Court has subject matter jurisdiction over the dispute pursuant to Section 4-402 of the Courts and Judicial Proceedings Article of the Maryland Code Annotated. There is no federal question as the Plaintiffs do not allege a count of failure to warn based on the prescription labeling of Remicade® and there is a lack of complete diversity of citizenship between the parties.

9.  At all times relevant herein the Defendant, Amerisourcebergen Drug Corporation P.O. Box, 959, Valley Forge, PA 19482 with its corporate headquarters located at 1300 Morris Drive, Suite 100, Chesterbrook, Pa 19087 *dba* Amerisource Bergen located and doing business at 401 E. Pratt Street,

Baltimore, Maryland 21202 (The World Trade Center), were individuals or business entities whose identities were engaged in, among other things, the selling of pharmaceutical products including Remicade® (infliximab) and within the State of Maryland and/or in other parts of the country. The company's business information regarding its activities at 401 E. Pratt appear on the internet, the company maintains a business telephone at this location, advertises for employee opportunities at this location, and maintains a physical office at 401 E. Pratt Street in Baltimore, Maryland. This Defendant was the distributor for Defendants J&J and its segment Centocor. The factual allegations of the preceding paragraphs are incorporated as though fully stated herein.

10. This court may exercise personal jurisdiction over these Defendants pursuant to section 6-103 of the Courts and Judicial Proceedings Article of the Maryland Code Annotated. As Defendants J&J and its' segment Centocor have no resident agents in Maryland, jurisdiction is asserted under the "long-arm" statue as these Defendants have sufficient Maryland contacts established through their distributor who sold Remicade to St. Joseph Medical Center who infused the drug into Crystal Mack, an individual who was authorized to receive the drug as a Medicaid patient.

### VENUE

11. Venue is proper in Baltimore City pursuant to Section 6-201(b) of the Court and Judicial Proceedings Article of Maryland Code Annotated because Defendant Amerisourcebergen Drug Company P.O. Box, 959, Valley Forge, PA 19482 with its corporate headquarters located at 1300 Morris Drive, Suite 100,

Chesterbrook, PA 19087 *dba* Amerisource Bergen is located and doing business

at 401 E. Pratt Street (World Trade Center), in Baltimore, Maryland. Civil cases

must be brought in the county where the defendant resides, carries on a regular

business, is employed, or habitually engages in a vocation. When no single

venue is applicable to all of the Defendants, the Defendants may be sued in any

jurisdiction in which one of them could be sued.  Jurisdiction is proper in

Baltimore City.

## FACTS COMMON TO ALL COUNTS

12. The Plaintiffs incorporate by reference the allegations contained in paragraphs 1

through 11 of this Complaint with the same effect as if herein fully stated.

13. Remicade ® (infliximab) researched, developed, manufactured, and sold by

Defendants J&J and its' segment Centocor and distributed by Amerisourebergen

Drug Corporation and Amerisource Bergen was cleared for marketing by the

Food and Drug Administration (FDA) on August 24, 1998, for treatment of

moderately to severely active Crohn's disease for the reduction of the signs and

symptoms in patients who have an inadequate response to conventional therapy.

Remicade® is indicated in Crohn's disease "for reducing the number of

draining enterocutaneous and rectovagnial fistulas and maintaining fistula

closure in adult patients with Crohn's disease." Remicade® was marketed by

J&J and its' segment Centocor as the first new product in 30 years indicated for

Crohn's disease.  "The availability of Remicade represented a breakthrough in

the treatment of Crohn's disease," said James Schoeneck, vice president and

general manager of the immunology business unit at Centocor in a press release

dated October 12, 1998.. Schoenck further stated, "Remicade offers patients and their physicians a new option that provides significant relief for most patients, with many **achieving clinical remission** (emphasis added)". The release further stated that "Centocor will sell Remicade® to wholesalers and distributors at a list price of $450 per vial and the average Crohn's patient will require 3 to 4 vials of Remicade® per infusion." Remicade® current market price is approximately $800 per vial. The treatment with 3mg/ kg Remicade q 8 weeks was the dose licensed by the Federal Drug Administration.

14. The press release by the Defendants stated, **"REMICADE(TM) (Infliximab) Now available Nationwide for Crohn's Disease: Breakthrough Therapy Offers Patients New Hope in Combating this Serious Gastrointestinal Condition."** Remicade is the first of a revolutionary new class of agents that blocks activity of a key inflammatory mediator called tumor necrosis factor alpha. Defendants who manufactured and distributed this drug further induced consumers to purchase Remicade® treatments by stating in the press release that, "In a clinical study, patients with moderate to severe Crohn's disease who did not respond to conventional therapy were treated with Remicade (5mg/kg). Eighty-two percent of Remicade –treated patients achieved a clinical response after four weeks compared to 16 percent of patients who received placebo (p less than 0.0001). In addition, 48 percent achieved clinical remission." Information contained in Defendants' press releases were issued to the news media and placed into the stream of general knowledge to influence physicians to order and consumers to request Remicade ® treatments.

15. Defendants J&J and its segment, Centocor and Amerisourcebergen manufactured and distributed Remicade®: 1) knowing that it was being manufactured and distributed in a defective condition which would result in serious health consequences to patients who would be transfused, 2) that the drug was unreasonably dangerous to patients who would use it, 3) that the product was expected and did reach consumers without substantial change in its condition due to exclusive distributors and infusion centers controlled by the defendants, 4) that it was known by the Defendants' that the defect in the product would cause serious injury, including the death of many patients who used it intravenously, 5) that the defect contributed or caused the death of Crystal Ann Mack to a reasonable degree of medical certainty, 6) and that the drug was being recommended and approved beyond its licensed dose by its' agents, servants, and employees to Crystal Mack and other patients to increase profits. The drug was administered at infusion sites by health care professionals who consulted with, were controlled or influenced by, and had written agreement with the Defendants to administer Remicade ®. These infusions centers were the agents or servants of the Defendants.

16. Shortly after placing Remicade® on the market and into commerce, this potent and dangerous drug became the subject of lawsuits filed across the country. The adverse reactions suffered by patients after being transfused with the drug were serious and often fatal and were reported to the Federal Drug Administration and to the Defendants. Defendants Centocor, J&J, and Amerisourcebergen knew that Remicade was dangerous and defective at the time that it left the

13

Defendants' possession or control and armed with this knowledge, the

Defendants consciously and deliberately disregarded the potential harm to

consumers. The Defendants continue to sell the drug to consumers and have

failed to recall the drug despite the fact that it was known by the Defendants,

prior to the death of Crystal Mack to cause deadly adverse reactions.

Specifically, the harm in this complaint of worsening heart conditions and

eventually heart failure that was experienced by Crystal Mack was clear from

the clinical trials and known to the inventors. The Defendants are strictly liable

for their conduct. Other serious side effects were tuberculosis, histoplasmosis,

listeria sepsis, invasive fungal infections, lymphoma, pneumocstosis, seizures,

multiple sclerosis, and lupus. Remicade® has been prescribed to over 230,000

individuals. The New Jersey Citizen Action and United Senior Action of

Indiana alleged in a lawsuit requesting class action lawsuit relief in the Superior

Court of New Jersey that, "due in part to its impact on the immune system-

Remicade® can cause severe side effects, including heightened susceptibility to

tuberculosis and infection caused by fungi or bacteria—Remicade ® is typically

used after patients have tried other treatments and failed to adequately respond

to conventional therapy. Moreover, because Remicade® is a combination of

human and mouse antibodies, many patients must also take methotrexate to

prevent their immune systems from rejecting the drug." A document available

to doctors on Centocor's website, stated that one "benefit" of prescribing

Remicade® was the "financial impact" on the physician's practice. According

to the federal government, Medicare's payments for Remicade reached $141

million in 2004, almost three times the $48 million the government paid for the drug in 2000.

17. Since the FDA approved Remicade®- a potent and dangerous drug in August of 1998, Remicade® has provided warning on numerous occasions and has often changed the warning in response to serious side effects and after marketing deaths. Statements in this complaint regarding Remicade® warnings include the issuing of "Dear Doctor" letters are for factual background purposes only and do not constitute allegations of a failure to warn under federal regulatory law. All counts are based on violation of Maryland common and statutory law.

18. In August 15, 2001, a "Black Box Warning" was added to the Remicade® warning stating that certain conditions were observed in patients receiving Remicade®. Due to the high profitability of this drug Defendants J&J, Centocor and Americasourcebergen refused to withdraw Remicade® from the market.

19. On October 18, 2001 a second warning was sent to healthcare professionals warning them not to initiate Remicade® therapy in patients with congestive heart failure, to discontinue Remicade® therapy in patients with congestive heart failure, to discontinue Remicade® in patients whose congestive heart failure is worsening and to consider discontinuing Remicade® in patients with stable congestive heart failure. Centocor provided in that letter that "upon review of preliminary results of its ongoing phase 2 trial in 150 patients with moderate to severe (NYHA class III-IV) congestive heart failure (CHF), higher incidences of mortality and hospitalization for worsening heart failure were seen in patients treated with Remicade®, especially those treated with the higher

dose of 10mg/kg. Seven of 101 patients treated with Remicade® died compared to no deaths among the 49 patients on placebo. Some of the reactions occurred more than one year after the initiation of Remicade®."

20. On January 2002, the FDA, based upon adverse drug reactions reports, issued a warning about serious medical conditions associated with the use of Remicade®.

21. On April 16th, 2007, J&J and Centocor who developed and manufactured Remicade® advised that patients who **had not achieved a response by week 14 were unlikely to respond to additional doses of Remicade**. These Defendants also advised that, "There have been post-marketing reports of worsening heart condition, with and without identifiable precipitating factors, in patients taking Remicade. There have also been rare post-marketing reports of new onset heart failure, including heart failure in patients without known pre-existing cardiovascular disease. Some of these patients have been under 50 years of age." Specific drug interaction studies had not been conducted as the letter advised. These Defendants warned of higher incidences of mortality and hospitalization due to worsening heart failure that was observed in patients receiving 10 mg/kg Remicade® dose. . The Defendants warned in the Medication Guide Remicade® (Rem-eh-kaid) (infliximab) of heart failure. The letter dated April 16, 2007 stated "Heart Failure :If you have a heart problem called congestive heart failure, your doctor should check you closely while you are taking REMICADE. Your congestive heart failure may get worse while you are taking REMICADE. Be sure to tell your doctor of any new or worse

symptoms including: Shortness of breath, swelling of ankles or feet, sudden
weight gain. Treatment with REMICADE may need to be stopped if you get
new or worse congestive heart failure."

22. On April 28, 2006, Crystal Ann Mack, the decedent, who was born November
11, 1980, presented to Dr. Lisa Savoie of Baltimore Surgical Specialist with
rectal bleeding (dark red & bright), history of depression, anemia, stable weight
and a heart rate regular. A protosigmoidoscopy was performed to 12 cm,
indicating friable, erthyerctous, muscose-bleed, easily-difused.

23. On May 2, 2006, Crystal Mack was seen by Dr. Nancy K. Bailowitz and a fax
was sent to Dr. Pichney. A section of this record was deleted and Plaintiffs do
not know at this point what appeared in the record. On May 19, 2006, Dr.
Bailowitz documented in the medical record of Crystal Mack that, "she may
have another tissue bleeding. Diarrhea x 3 days. Blood on toilet tissue. Wt. 76 ¾
…Imp:  Refer to surgery to eval:"

24. Crystal Mack was later referred by Dr. Scott Rifkin to Defendant Dr. Lisa
Pichney, a board certified gastroenterologist whom held herself out as
competent to treat gastrointestinal diseases including Crohn's. On May 18,
2006, Dr. Pichney stated in correspondence to Dr. Rifkin regarding her
examination and evaluation of Crystal Mack that her complaint was diarrhea
and bleeding. Further, Defendant Pichney stated that Mack was healthy until
four weeks ago when she began having running diarrhea stools with bleeding.
The onset of the conditions was greater than four weeks reported in the medical
record. Ms. Mack was not on any medications, and was not experiencing

vomiting, fatigue, and nausea. Her heart-cardiac rate and rhythm were normal

without murmur, rate of gallop. Her aortic pulsation was normal. The plan of

treatment was based on the fact that she was slightly tacycardiac and the

physician indicated that she would increase the fluids in her diet. Dr. Pichney

indicated that she was going to get an upper GI/small bowel series.

25. On September 18, 2006, Dr. Pichney noted in the decedent's records that she

"has a problem being in crowds and does not follow-up necessary according to

her sister." Her Heart-tachycardia at that time was about 90.

26. On September 15, 2006, Dr. Pichney documented in Crystal Ann Mack's

medical record that she was experiencing weight loss and vomiting.

27. On September 17, 2006, a lab report regarding Crystal Mack advised Dr.

Pichney that the "possibility of an infectious process could not be excluded."

28. On September 19, 2006 at St. Joseph Medical Center, Dr. Pichney performed an

unsuccessful attempt to ascertain the severity of Crystal Mack's illness. Dr

Pichney documented that "a flexible sigmoidoscopy was scheduled in May

2006.  A colonoscopy was scheduled on August 15, 2006." Dr. Pichney

documented on this date that she was unable to perform the procedure in her

operative report from the Maryland Endoscopy Center. Pichney writes, "I did

not retroflex because I did not want to irritate the area further. A complete

colonoscopy could not be done at that time." Dr. Pichney further documents that

"wt loss from 80 pounds to 69 pounds, stable gluta solve for "her malnutrition",

"because of her low body index and significant weight loss, it was thought that

she may have possible underlying eating disorder,…she has a chronic

depression for which sees a psychiatrist as an outpatient." Crystal Mack was not

seeing a psychiatrist as Defendant Pichney stated in the medical records. Dr.

Pichney's report stated that, "Ultimately she may require Remicade but Entocort

may be a better choice for her given her affect and need not to be in hospital

situations." On September 19, 2006, Dr. Neeta S. Deshpande of St. Joseph

Medical Center noted that Crystal Mack was referred to the emergency room for

admission for anemia and "poorly controlled inflammatory bowel disease." Dr.

Deshpande stated that "she complains of bloody diarrhea with diffuse

abdominal cramps, nausea and vomiting and generalized weakness for the past

week. She reports about 10 to 20 bloody bowel movements per day. She is

unable to keep any food down and has persistent nausea and vomiting. She

denies any fevers or chills. She also complains of weight loss. She is down from

her usual weight of 80 pounds to 69 pounds in the past one week. She was

recently started on Medrol Dosepak by Dr. Pichney. Yesterday was her third

day. She was referred to the emergency room for the above symptoms and for a

CT scan of her abdomen and subsequently admitted for severe anemia with

hemoglobin of 8 and hematocrit of 25."

29. On September 28, 2006, Dr. Pichney documented that Crystal Mack, who was

on Entrocort, was having problems swallowing, her heart "still a little

tachycardic" and further, "see if we can get her approved for remicade." Dr.

Pichney stated that "Crystal need a PP prior to remicade." There was no

documentation by Dr. Pichney that she would order Remicade because Mack

was having an inadequate response to Entocort. James Mack also advised this physician that his family physician had verbally communicated to him that Remicade ® could benefit his daughter.

30. Entocort did not have the serious side effects associated with worsening heart conditions or heart failure. The medication was not contra-indicated with patients with heart conditions as Remicade® had been.

31. On October 26, 2006, Dr. Pichney documented in the Mack record "on prednisone 40, unable to get the entocort down, gained four to five pounds, heart-"rate and rhythm regular, normal S1 and S2 without murmur." The treatment plan was noted to be Remicade 5 mg to set up over 2 hours. On October 26, 2006, Dr. Pichney ordered remicade 5m over 2 hours, Tylenol 650 mg, bendryal 25 mg, prednisone 40 mg.

32. On October 30, 2006 Dr. Pichney wrote a standing order "transfuse 2 units packed with remicade RX please."

33. On November 14, 2006, a note to Dr. Pichney's chart stated that, "Crystal's mother called. Crystal fell back of head bleeding-sent to ER. Got dizzy." Although Dr. Pichney documented in the medical records that she sent Crystal Mack to the emergency room, in fact, James and Sylvia Mack took Crystal Mack to the emergency room and later called Dr. Pichney. There is no showing that the defendant physicians, Dr. Pichney or Dr. Mancoll followed up regarding the fainting spell which caused the referral to Northwest Hospital

34. The Northwest Hospital ED Triage Assessment performed on 11/14/06 at 3:48 listing Rebecca Mancoll as the treating physician states that Crystal Mack

"states she fell/passed out in the bathroom and hit her head on bath tub. Pt.

states that a new medication she is taking made her dizzy, possible loc, pt. not

sure." The CT scan impression was "negative non enhanced brain CT scan. Her

pulse rate was 125 bpm. Hematocrit was 26.1L."

35. On November 26, 2006 Crystal Mack came to the emergency room at St. Joseph

Hospital for gastrointestinal bleeding. At that time the medical record reflects,

"the patient noticed ongoing gastrointestinal bleeding for about 7 days. Pulse

rate on arrival was 130." Follow-up by the patient after discharge was to be with

Dr. Pichney.

36. On November 27, 2006, in a follow-up appointment with Mack, Dr. Pichney

stated "feels better after her first remicade" "Next treatment 11-1, and after that

she will do another one. She was do in four weeks. On prednisone 40 mg

decrease it to 35 mg…" Heart- "she remains tachycardia but this is normal for

her rate and rhythm regular."

37. On November 29, 2006 at 3:50 Crystal Ann Mack was admitted for Remicade®

therapy at St. Joseph Medical Center with a heart rate of 140. The nursing staff

advised Dr. Pichney. The staff wrote, "Dr. Pichney was made aware and wants

us to give Remicade."

38. On November 30, 2006, Crystal Ann Mack was admitted to St. Joseph Medical

Center with a hematocrit of 19%.She received two units of blood and her

hematocrit increased to 30%. Her blood sugar was 400 prior to admission. She

was covered with sliding scale insulin and received 10 units of Lantis the night

before discharge.  On the morning of discharge her blood sugar ranged was

between 85-100. Crystal Mack was referred to Dr. Mancoll for follow-up for her sugar level and to Dr. Lisa Pichney as scheduled for "treatment of her Crohn's disease."

39. On December 5, 2006, Crystal Mack visited Dr. Mancoll and indicated that she had "just starting to urinate alot yest" Dr. Mancoll ordered labs for blood sugar and requested that Crystal Mack return for a follow-up in a week. Dr. Mancoll indicated that she would see if "Bay West Endo has appt for her." There is no support in the medical record that Dr. Mancoll undertook a plan of care for Mack's serious medical concern relating to sugar. This is significant given that Dr. Locke of the Office of the Medical Examiner opined that "diabetes mellitus is a contributing factor," to Mack's death.

40. On December 27, 2006, St. Joseph Medical Center infused Remicade® as ordered by Dr. Pichney.

41. On January 4, 2007, Crystal Mack had a follow-up visit with Dr. Pichney in which the physician states in Mack's record that she has had two and six-week remicade treatments in six to eight weeks and that she will "Will probably need a colonoscopy." The plan was, "**we are going to give her a break from all of these medical things and let her get back to her normal life. See her back in about 10 weeks which will be after the next remicade treatment**." "Subsequent to that we will set up her colonoscopy." No subsequent colonoscopy was ever ordered by Dr. Pichney or performed at this office visit. This was Crystal Mack's last visit to Dr. Pichney before her death. Dr. Pichney

stated, "I would like to see her back probably in about 10 weeks, which will be after her next Remicade treatment."

42. On January 24, 2007 Dr. Pichney received a call from Crystal Mack at 11:35 a.m. stating that she had "rapid heartbeat, little bloody/tired and out of breath." Crystal Mack was admitted as an inpatient at St. Joseph Hospital from January 24, 2007 until January 25, 2007 and reported to the health care providers that she experienced "ongoing Gastrointestinal bleeding" for approximately seven days. Her initial hematocrit was 25.7. Her heart showed tachcardicaction. Crystal Mack was admitted because of weakness. The St. Joseph treatment note on this date states "History of present illness: C/O being tired for 1 week & rapid heartbeat. Dr. Pichney set pt to ER." Her heart rate was 130 on admission. Crystal Mack was found to be anemic and her initial hematocrit was 25.7. Crystal Mack received one unit of blood. Dr. Milena Miljkovic's history and physical note on this date was copied to Defendants Lisa Susan Pichney M.D., and Rebecca Mancoll, M.D. Dr. Miljikov's plan was to discharge Crystal Mack to her home, "to be followed by her gastroenterologist, Dr. Pichney. The physicians on this date at St. Joseph Medical Center also ordered that 2 units of PRCC's be transferred urgently due to active bleeding and symptomatic anemia. Dr. J. Larson Locke of the office of the medical examiner opined that Crystal Mack, "died of intestinal hemorrhage due to inflammatory bowel disease (Crohn's disease.) Diabetes mellitus is a contributing factor." Dr. Locke noted that "the mucosa had numerous ulcerations throughout the surface giving a

"peebly" appearance. Several of these ulcers appeared grossly inflamed and hemorrhagic."

43. On January 25, 2007, Crystal Mack was again infused at the St. Joseph Medical Center with Remicade®.

44. On February 2, 2007, an EKG revealed sinus tach with 130 rate when Crystal Ann Mack was seen at Defendant St. Joseph Medical Center. Notes by the staff and treating physicians state that the chief complaint was arrhythmia and that she was sent to the emergency room by Dr. Mancoll. Dr. Mancoll on this date documents in the patient chart "anemia-fatigue" "given pt's tachycardia & continuing bleeding (Crohn's) pt strongly advised to return to St. Joseph's ER. I personally called ER & Dr. Pichney." Dr. Christopher C. Lorentz diagnosed rapid heart beat at St. Joseph Medical Center. He recommended that Crystal Ann Mack follow-up with Dr. Mancoll "as needed or worsening as soon as possible."

45. On February 9, 2007, an examination by Dr. Mancoll as a "f/u er" stated "tachycardia on exam" "rectal bleeding" "may need to stop. "tachycardic or possible   to "clitizone." There was a note to "see Dr. Fisher or Klein." Crystal Mack, although a patient who regularly contacted her physicians when she believed she was experiencing abnormal bleeding, did not appreciate the masking of symptoms by Remicade® when taken and ordered concomitantly.

46. On February 21, 2007, Crystal Mack received an infusion of Remicade® after admission to the Serpick Infusion Center at St. Joseph Medical Center.  GI symptoms were rectal bleeding. The health care providers again stated that "Pt.

states a minimal amount of rectal bleeding when the steroids wear off at the end of the day." Mack's pulse was 123 and blood pressure was 97/65 at 15:04 hours. Given that Mack was hypotensive, reported bleeding at the end of the day and had a pulse rate of 123, and her medical records at St. Joseph Hospital indicated that she had suffered from dehydration, was anemic, and had previously been transfused blood at the hospital These registered nurses were the last health care providers to treat Crystal Mack before the date of her death approximately 10 days later.

47. On April 12, 2007 or thereabout, Crystal Mack was scheduled to receive another Remicade® treatment. Crystal Mack received a call from Defendants Pichney and St. Joseph Medical Center's Infusion Center stating that her planned Remicade® evaluation and treatment would be rescheduled as there was a staff shortage. Crystal Ann Mack, although a college student, could not be expected to evaluate and make decisions regarding a potent biological drug such as Remicade®. On April 17, 2007, Crystal Mack was playing a card game with her twin sister at her home located at 4 Bridgeton Court in Owings Mills, Maryland when she informed her that she was going to the bathroom. Several minutes later, she was found lying on the bathroom floor. The Mack family placed a 911 call and an ambulance arrived within minutes at which time paramedics undertook activities in an attempt to save her life. Crystal Mack was rushed by ambulance to Northwest Hospital and was later pronounced dead. The cause of her death was determined to be cardiac arrest at Northwest Hospital pronounced by Dr. Mahajan at 1650 hours.

## COUNT I

### (Survival Action by the Estate)

James Mack, Personal Representative of the Estate of Crystal Ann Mack,

Plaintiffs, claims against J& J, Centocor Inc., and Amerisourcebergen Drug

Corporation as follows:

48. Plaintiffs, adopt by reference the allegations contained in paragraphs 1 through

47 of this complaint with the same effect as if herein fully set forth.

49. That as previously stated these Defendants, researched, developed,

manufactured and distributed Remicade® and are strictly liable for the potent

and harmful drug that was unreasonably dangerous as the risks outweighed the

benefits of the drug when administrated to patients suffering from any heart

condition. Further, this drug was known by the Defendants to cause significant

adverse reactions in development, clinical trials, and after marketing reports.

Remicade ® was the specific injury to Crystal Mack in that it worsened her

heart condition after ingestion of Remicade® and caused or contributed to her

death to a reasonable degree of medical certainty.

50. The patent investigation related to sargramostism (Remicade®- investigate

agent) at 6,500,418 of December 21, 2002 alerted the Defendants to the

problems associated with the infusion of this drug. Only 10 of 17 patients were

responders in the investigative example 2. Spontaneous closure of perianal

fistulas was very rare. The investors stated that "Nevertheless, as this is a new

and counterintuitive approach to a chronic inflammatory disease, we are closely

monitoring patients for safety and any adverse effects during this protocol." The

inclusion criteria for one treatment group was a "history of Crohn's disease for at least three months with extend of disease described endoscopically or radiologically within the past three years. If using oral corticosteroids, patients must have been using them more than 8 weeks, and been on a stable dose (greater mg/day of prednisone equivalent) for at least 4 weeks prior to trial enrollment." Crystal Mack had not had the extent of her purported Crohn's described as Dr. Pichney was unable to do a complete examination on two occasions. Patients were excluded from the study who had "significant unexplained abnormalities in any of the prescreening blood work." The study did not account for "ongoing gastrointestinal bleeding" as was experienced by Crystal Mack. The study involved "initial dose: 3.5 micrograms per kilogram per day SQ. Doses are based on the patient enrollment weight." The study did not account for a patient like Crystal Mack who at 26 years of age was anemic, had a body weight under 80 lbs, and lost significant weight and blood while the infusion dosage remained unchanged. In example 4, patients were examined weekly during the trial with telephone calls once a week as well for safety monitoring; also, patients completed a daily diary throughout the study. In the instant case, Dr. Pichney scheduled an appointment for Crystal Mack 10 weeks from her last office visit, no calls were made for safety monitoring, and she was never requested to complete a diary. These activities and monitoring during the clinical trial setting could not have been reasonably expected to have been implemented once the Remicade® was introduced into the stream of commerce. Even with this extensive monitoring during the clinical "serious toxicities" were

reported to have "been associated with doses greater than 10 mcg/kg/day."
There were reports of low blood pressure, breathing problems and heart failure.
Armed with the knowledge that patients needed close clinical monitoring after
Remicade® infusions, the Defendants still introduced Remicade® for sales to
to the general population.

51. On June 13, 2006, almost five years later, the adverse consequences with this
drug for patients persisted as evidenced in patient 7,060,262. The possible
adverse events reported in part were, "Patients receiving GM-CSF
(Sargramostism) have experienced fever, chills, nausea, vomiting, diarrhea,
fatigue, weakness, headache, decreased appetite, thrombosis, rapid or irregular
heartbeat or other heart problems, feeling of faintness, facial flushing, pain in
the bones, muscles, chest, abdomen, and joints; local reaction at the site of
injection; rashes; and kidney and liver dysfunction... Patients with prior heart,
lung, kidney or liver problems may have worsening of their symptoms
following administration of Sargramostism. There may be other side effects that
could occur."

52. The investigative patent group studies, the clinical trials, and the after-
marketing adverse incident reports evidences that Remicade® was and remains
is a potent and dangerous drug in which the risks greatly outweigh the benefits
to patients to a reasonable degree of scientific certainty and the Defendants
manufacture and distribute this drug for profits with intent to some harm
patients. The Defendants were armed with sufficient evidence to recall this drug
from the market and refused to do so for the enormous profits they have reaped

and will continue to reap from patients and the federal government who pay for

substantially all of the costs associated with Remicade ® therapy for Medicaid

patients such as Crystal Mack. Accessone as agents, servants or employees of

defendant J&J and its' business segment Centocor participated in the scheme to

reap these profits by entering into an agreement with Crystal Mack and assisting

Dr. Pichney with qualifying Mack with Medicaid for the drug as a "medical

necessity." In fact, there was no medical necessity as Crystal Mack was being

prescribed Entocort, had not been diagnosed with Crohn's disease and has no

known fistula(s). The use of this drug for Crystal Mack was illegal. Specifically,

such use as to Crystal Mack, caused or contributed to a reasonable degree of

medical certainty to her worsening heart condition, hospitalization, pain and

suffering, heart failure, and eventual death.

53. The advanced consumer information for prednisone which was prescribed by

Dr. Pichney states that "diabetes mellitus (sugar diabetes)-corticosteriods may

cause a loss of control of diabetes by increasing blood glucose and further that

"ulcerative colitis, severe-corticosteroids may cover up symptoms of worsening

stomach or intestinal conditions. A patient would not know if his or her

condition was getting worse and would not get medical help when needed."

Further amaryl was ordered by these physicians to be taken concurrently with

the prednisone and Remicade®. The PDR Pocket Guide to Prescription Drugs

states that," If amaryl is taken with certain other drugs, the effects of either

could be increased, decreased, or altered. It is especially important to check with

your doctor before combining Amaryl with the following... corticosteroids such

29

as prednisone." Remicade® was placed on the market and despite adverse
reactions, steps were not taken to test the administering of this drugs with other
drugs  that was being ordered for Crystal Mack. The Defendants had a duty to
evaluate the interactions of drugs Crohn's patient or those who were diagnosed
with Crohn's would be prescribed while receiving Remicade ® treatments. The
drug should not have been introduced or remained on the market when its '
biological consequences where not known, the drug produced varying serum
levels in patients, and its interactions with other drugs that might be ordered had
not been tested.

54. The Defendants knew that Crystal Mack had not shown clinical improvement
within 14th week through its agent servant or employee Accessone. After week
fourteen, there was no need to administer Remicade® to Crystal Mack. Armed
with this knowledge, the Defendants to increase profits, continued to assist with
the approval of infusion to Mack, a Medicaid patient, to increase profits with
knowledge that in continuing the infusions that the adverse consequences
outweighed the benefits of Remicade® infusions.

55. As a direct and proximate result of the Defendants' conduct in willful placing of
this harmful and deadly drug in the streams of commerce with knowledge that it
would cause severe adverse reactions including death, the failure to recall this
drug in light of significant and often deadly adverse consequences after
marketing, and the continued approving of the drug as a "medical necessity" by
their agents, servants, or employees, when the adverse consequences
outweighed the potential benefits and no improvement in Mack's condition

could not be expected, Crystal Mack endured great bodily pain and economic loss, severe painful and bodily injury, pain and suffering and mental anguish, hospitalization, death, and other related injury.

56. Wherefore, James Mack, Personal Representative of the Estate of Crystal Mack, requests compensatory damages against J &J, Centocor Inc., and Amerisourcebergen Drug Corporation, jointly and severally, in the amount of twenty five million compensatory damages, together with costs, expenses, and post judgment interest and seventy five million dollars in punitive damages against each and every defendant for their willful conduct with intent to cause injury to Crystal Mack. The plaintiffs furthermore demand post judgment interest.

## COUNT II

### (Survival Action by the Estate)

James Mack, Personal Representative of the Estate of Crystal Ann Mack, Plaintiffs, claims against J &J, Centocor Inc., and Amerisourcebergen Drug Corporation as follows:

57. Plaintiffs, adopt by reference the allegations contained in paragraphs 1 through 56 of this complaint with the same effect as if herein fully set forth.

58. These Defendants knew that the representations that were made regarding Remicade® as set forth in the preceding paragraphs were false when made, including the representation that this drug was safe and that Crystal Mack required Remicade® treatments after the period that it would be beneficial in her treatment. The Defendants had a duty not to mislead patients regarding the

safety of the drug and the approved use of Remicade®. Additionally, the
Defendants had a duty not to continue to process documents through it's agent,
servants, or employees at Accessone evidencing that Crystal Mack needed
Remicade after the period that it would be beneficial The false statements made
by Accessone on behalf of the Defendants as its agent, servants, or employees to
qualify Crystal Mack for Medicaid benefits was fraudulent.  Accessone, the
agents, servant, or employees of these Defendants deceived Crystal Mack into
taking unneeded treatments of Remicade to increase sales of Remicade and
make profits from Medicaid patients, such as Mack. This act of fraud was a civil
conspiracy in which the Defendants by their conduct entered into to make
profits and increase sales.

59. Crystal Mack acted in justifiable reliance on the Defendants false
representations that the drug was safe and that she needed the Remicade®
treatments.

60. The acts of fraud engaged in by these Defendants resulted in a civil conspiracy
which were willful with intention to injure and defraud Crystal Mack of her
Medicaid benefits and funds that she expended to meet co-pays for Remicade®
treatment, and expenses as a result of the conspiracy. This fraud was an
intentional misrepresentation.

61. As a direct and proximate result of the willful conspiracy to approve the drug as
a medical necessity after it was no longer beneficial and the false statements and
representations made to Crystal Mack, she endured great bodily pain and

economic loss, severe painful and bodily injury, pain and suffering and mental anguish, hospitalization, death, and other related injury.

62. Wherefore, James Mack, Personal Representative of the Estate of Crystal Mack, requests compensatory damages against J &J, Centocor Inc., and Amerisourcebergen Drug Corporation, jointly and severally, in the amount of twenty five million dollars for compensatory damages, together with costs, and post judgment interest, and seventy five million dollars in punitive damages against each and every defendant for their willful conduct with intent to cause injury to Crystal Mack with post judgment interest..

## COUNT III

### (Survival Action by the Estate)

James Mack, Personal Representative of the Estate of Crystal Ann Mack, Plaintiffs, claims against J &J, Centocor Inc., and Amerisourcebergen Drug Corporation as follows:

63.   Plaintiffs adopts by reference the allegations contained in paragraphs 1 through 62 of this complaint as though stated fully herein.

64. The injuries and damages were caused to Crystal Mack by the defects in the development, testing, and manufacturing of Remicade®.

65. The Defendants warranted, expressly and impliedly, that this potent and dangerous drug was safe for use by the verbal communications by it's sales force to physicians.

66. That these Defendants, at the time of placing Remicade® into the stream of commerce had reasons to know the particular purpose for which Remicade®

would be used and that Crystal Mack and other users were relying on the skill,

judgment and warranties of the Defendants, yet the Defendants, failed to

provide a safe drug for use for the purposes it warranted. All such defects

rendered Remicade® unfit and unmarketable.

67. As a result of the Defendants acts, the Plaintiff suffered damages as a direct and

proximate cause of this conduct.

68. Wherefore, James Mack, Personal Representative of the Estate of Crystal Mack,

requests compensatory damages against J &J, Centocor Inc., and

Amerisourcebergen Drug Corporation, jointly and severally, in the amount of

twenty five millions dollars compensatory damages, together with costs,

expenses and post judgment interest, and seventy five million dollars in punitive

damages against each and every defendant for their willful conduct with intent

to cause injury to Crystal Mack with post judgment interest.

## COUNT IV

### (Survival Action by the Estate)

James Mack, Personal Representative of the Estate of Crystal Ann Mack,

Plaintiffs, claims against J &J, Centocor Inc., and Amerisourcebergen Drug

Corporation as follows:

69. Plaintiffs adopts by reference the allegations contained in paragraphs 1 through

68 of this complaint as though stated fully herein.

70. That, Defendants, undertook to develop, manufacture and place in the stream of

commerce Remicade®, a potent drug, which should have been safe for the use

on patients.

34

71. The Defendants, breached the duty owed to Crystal Mack when they developed, manufactured and placed Remicade ® in the stream of commerce and that the drug was unsafe for use on the public and further:

    a.  were negligent in failing to adequately testing, researching, and developing Remicade® before placing the product in the stream of commerce,

    b.  were negligent in that the compounds used in the drug were never changed although patients suffered significant adverse reactions during the clinical trials,

    c.  were negligent in that healthcare providers were never provided adequate protocols for monitoring patients after Remicade® infusions,

    d.  were negligent in that after market adverse reporting proved that the drug was extremely dangerous and should be recalled, and the Defendants failed to do so,

    e.  were otherwise negligent under the circumstances under the circumstances then and there existing

72. That the Defendants' knew or should have known by the exercise of reasonable care that the defects would be unknown to the public and likely to cause injury.

73. That the Defendants, knew of the condition for a long period of time and in fact created the condition and has had ample opportunity to correct the defect but failed and neglected to do so.

74. That Defendants' failure to correct the defects present were the cause of Crystal Mack's injury.

75. The Defendants' knew or should have known that Crystal Mack would not discover or realize the dangers present.

76. That as a result of said negligence, Plaintiff, sustained serious injury including pain and suffering, hospitalizations, heart failure, and eventually, funeral expenses, and other damages including economic as a direct and proximate cause of the Defendants act and or omissions to a reasonable degree of medical certanity.

77. Wherefore, James Mack, Personal Representative of the Estate of Crystal Mack, requests compensatory damages against J &J, Centocor Inc., and Amerisourcebergen Drug Corporation, jointly and severally, in the amount of twenty five million dollars compensatory damages, together with costs, expenses and post judgment interest and seventy five million dollars in punitive damages against each and every defendant with post judgment interest for their willful conduct with intent to cause injury to Crystal Mack.

## COUNT V

### (Survival Action by the Estate)

James Mack, Personal Representative of the Estate of Crystal Ann Mack, Plaintiffs, claims against J &J, Centocor Inc., and Amerisourcebergen Drug Corporation as follows:

78.   Plaintiffs adopts by reference the allegations contained in paragraphs 1 through 77 of this complaint as though stated fully herein.

79.   Crystal Mack entered into a contract with the Defendants through their agents, servants, and employees of Accessone to provide assistance, guidance, counseling, and therapy follow-up regarding Remicade®.

80.   The costs for these services were passed on to Crystal Mack as a "cost of the product."

81.   The Defendants breached the contract by not advising Crystal Mack that she should have discontinued the treatment at 14 weeks, that therapy should be closely monitored, and that she was experiencing adverse reactions from the use of the drug at their infusion centers operated, controlled, monitored, and licensed by the agents, servants, or employees of the Defendants.

82.   As a result of the breach by the Defendants, the Claimant suffered economic loss, hospitalization, pain and suffering, mental anguish, and death. Crystal Mack paid consideration for the benefits of the contract as she was billed for the services of the contract by Accessone from sales to her of Remicade®.

83.   Wherefore, James Mack, Personal Representative of the Estate of Crystal Mack, requests compensatory damages against J& J, Centocor Inc., and Amerisourcebergen Drug Corporation, jointly and severally, in the amount of twenty five million dollars compensatory damages, together with costs, expenses and post judgment interest, and seventy-five million dollars in punitive damages with post judgment interest, against each and every defendant for their willful conduct with intent to cause injury to Crystal Mack.

## COUNT VI

**(Surviving Parent Claim- James Mack)**

37

James Mack, Plaintiff, sues Defendants Amerisourcebergen Drug Corporation, Johnson & Johnson, and Centocor as follows:

84. Plaintiff, James Mack, incorporates by reference the allegations in paragraphs 1 through 83 of the complaint as though stated fully herein.

85. James Mack greatly loved and cherished his daughter, and enjoyed a very close father-daughter relationship, and each provided to the other a deep love, support, companionship, pride and ongoing happiness.

86. As a result of the loss of his daughter directly and proximately caused by the Defendants' acts or omissions including negligence and willful conduct, James Mack has sustained and will continue to permanently sustain, enormous grief and sorrow, mental anguish, emotional pain and suffering, loss of society, companionship, comfort, attention, advice, counsel and guidance.

87. This claim is being brought within three years of the date of Crystal Mack's death, in accordance with section 3-904 (g) (1) of the Court and Judicial Proceedings Article of the Maryland Annotated Code.

88. WHEREFORE, James Mack, requests compensatory damages in the amount of two million dollars from Defendants, jointly and severally, in an amount in excess of the minimum jurisdiction of the Circuit Court for Baltimore City, together with reasonable costs, expenses, post judgment interest, and such other and further relief, as justice requires.

## COUNT VII

### (Surviving Parent Claim- Sylvia Mack)

Sylvia Mack, Plaintiff, sues Defendants Amerisourcebergen Drug Corporation, Johnson & Johnson, and Centocor Inc. as follows:

89. Plaintiff, Sylvia Mack, incorporates by reference the allegations contained in paragraphs 1 though 88 of the complaint as though stated fully herein.

90. Sylvia Mack greatly loved and cherished her daughter, and enjoyed a very close mother-daughter relationship, and each provided to the other a deep love, support, companionship, pride and ongoing happiness.

91. As a result of the loss of her daughter directly and proximately caused by the Defendants' acts or omissions including negligence and willful conduct, Sylvia Mack has sustained and will continue to permanently sustain, enormous grief and sorrow, mental anguish, emotional pain and suffering, loss of society, companionship, comfort, attention, advice, counsel and guidance.

92. This claim is being brought within three years of the date of Crystal Mack's death, in accordance with section 3-904 (g) (1) of the Court and Judicial Proceedings Article of the Maryland Annotated Code.

93. WHEREFORE, Sylvia Mack, requests compensatory damages from the Defendants in the amount of two million dollars, jointly and severally, in an amount in excess of the minimum jurisdiction of the Circuit Court for Baltimore City, together with reasonable costs, expenses and such other and further relief as justice requires.

Respectfully submitted,


Donald R. Huskey
Law Offices of Donald R. Huskey LLC
1023 North Calvert Street 3rd Floor
Baltimore, Maryland 21202
410 347-7979


Governor E. Jackson, III
Law Offices of Governor E. Jackson, III, LLC
1023 North Calvert Street, 4th Floor
Baltimore, Maryland 21202
410 528-5150

Attorneys for Plaintiffs