**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| JAMES MACK, Individually, and as Surviving Parent and Personal Representative of the Estate of Crystal Ann Mack, | * | |
| | * | |
| and | * | Civil Action No. RBD 08-688 |
| SYLVIA MACK | * | |
| Plaintiffs, | * | |
| v. | * | |
| AMERISOURCEBERGEN DRUG CORPORATION, d/b/a/ Amerisource Bergen, et al. | * | |
| | * | |
| Defendants. | * | |

_____

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Donald R. Huskey  Bar No. 22981
Laws Offices of Donald R. Huskey LLC
1023 North Calvert Street
3rd Floor
Baltimore, Maryland 21202
Tel: 410 347-7979


Governor E. Jackson, III, Bar No. 27673
Law Office of Governor E. Jackson, III, LLC
1023 North Calvert Street 4th Floor
Baltimore, Maryland 21202
Tel: 410-528-5150

*Attorneys for Plaintiffs*

1

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES …………………………….............................. 3

PRELIMINARY STATEMENT   …………………………….........................6

STATEMENT OF MATERIAL UNDISPUTED FACTS………………………6

SUMMARY JUDGMENT…………………………….....................................12

ARGUMENT……………………………….........................................................16.

## Tables of Authorities

**Cases**

*Adams v. Owens Illinois, Inc.* 119 Md. App. 395, 411-12, 705 A.2d 58, 66-67 (1998)

*Alleco v. The Harry and Jeanette Weinberg Foundation,* 340 Md. 176, 665 A. 2d 1038 (1995).

*Allen v. Bethlehem Steel Corp.,* 76 Md. App. 642, 547 A. 2d 1105,*cert denied,* 314 Md. 458, 550 A. 2d 1168 (1988

*Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 249-50 (1986)

*Barb v. Wallace*, 45 Md. App. 271, 278-81, 412 A.2d 1314, 1318-19 (1980)

*Benedi v. McNeil-PPC Inc.,* 66 F.3d 1378 (4th Cir. 1999)

*Bond v. Nibco, Inc.* 96 Md.App. 127, 138-39, 623 A.2d 731, 737 (1993)

*Brooks v. Medtronic*, 750 F.2d 1227 (4th Cir. 1984)

*Carey v. Fiberfloat Corp.,* 849 F. Supp. 423, 425 (D. Md 1994)

*Celotex Corp. v. Catrett,* 477 U.S.317, 322 (1986)

*Columbia Real Estate Title Ins. Co. v. Carusco,* 39 Md. App. 282, 288 A. 2d at 472.

*Continental Masonry Co. v. Verdel Constr. Co.*, 279 Md. 476, 480, 369 A.2d 566,  569 (1977)

*Copiers Typewriters Calculators, Inc. v. CMI Corp.*, 651 F.Supp. 641, 649 (D.Md. 1986)

*Daubert v. Merrell Dow Pharmaceuticals, Inc.* 509 U.S. 579 (1993)

*Daughtery v. Kessler,* 264 Md. 281, 286 A. 2d 95(1972).

*Decoster Co. v. Westinghouse Elec. Corp.*, 333 Md. 245, 260, 634 A.2d 1330, 1337 (1994)

*Dudley v. Baltimore Gas & Electric Co.*, 98 Md. App. 182, 632 A.2d 492 497 (1993)

*Ellsworth v. Sherne Lingerie, Inc.* 303 Md. 581, 495 A.2d 348 (1985)

*Erie R.R. v. Tompkins*  304 U.S. 64, 58 S. Ct. 817, 82 L. Ed 1188 (1938)

*Firestone Tire & Rubber Co. v. Cannon*, 53 Md. App. 106, 452 A.2d 192 (1992), aff'd, 295 Md. 528, 456 A.2d (1993)

*Fischbach & Moore Int'l Corp. v. Crane Barge R-14*, 632 F.2d 1123, 1125 (4th Cir.)

*Food Fair Stores, Inc. v. Blumberg*, 234 Md. 521, 534, 200 A.2d 166, 174 (1964)

*Freedman v. Case Corp.*, 118 F. 3D (4th Cir. 1997)

*Giant Food v. Ice King, Inc.,* 74 Md. App. 183, 536 A.2d 1182.

*Giant Food, Inc. v. Washington Coca-Cola Bottling Co.*, 273 Md. 593, 602-07, 332 A.2d, 1, 7-10 (1975)

*Gross v. Sussex Inc.,* 332 Md. 247, 630 A. 2d 1156  (1993).

*Haischer v. CSX Trasp.*, 381 Md. 119, 848 A. 2d 620 (2004)

*Higgins v. General Motors Corp.*, 465 S.W. 2d 898 (Ark. 1971)

*Hilliday v. Strum, Ruger & Co.*, 368 Md. 186, 209, 792 A.2d 1145 (2002)

*Joffre v. Canada dry Ginger Ale, Inc.,* 222 Md.1, 158 A.2d 631 ((1960).

*Kelley v. R.G. Industries, Inc.,* 304 Md. 124, 497 A.2d 1143 (1985)

*Lock, Inc. v. Sonnenleiter*, 208 Md. 443, 451, 118 A.2d 509 (1955)

*Marder v. G.D. Searle & Co.*, 630 F.Supp., 1087 (D.Md.1986)

*Marshall v. Sellers,* 188 Md. 508, 518-19, 53 A.2d, 5, 10 (1979)

*May v. Roadway Express, Inc.*, 221 F. Supp 2d. 623, 626-27 (D. MD 2002)

*Owens-Illinois, Inc. v. Zenobia*, 325 Md. 420, 601 A.2d 653 (1992)

*Phillips v. General Motors Corp.*, 278 Md. 337, 344, 363 A.2d 955, 958 (1976)

*Richardson v. Phillip Morris, Inc.*,  950 F. Supp. 700 (D.Md. 1977)

*Rockstroh v. A.H. Robins*., 602 F. Supp. 1259 (D. Md. 1985)

4

*Security Constr. Co v. Maietta,* 25 Md. App. 303, 334 A.2d 133 (1975)

*Stone v. Chicago Title Ins. Co.*, 330 Md. 329, 338-42, 624 A.2d 496 (1993)

*Thomas v. Ford Motor Credit Co.,* 48 Md. App. 617, 429 A. 2d 277 (1981).

*Van Royen v. Lacey,* 262 Md,  94, 98, 277 A,2d 13, 14 (1971).

*Welsh v. Century Products, Inc.* 745 F. Supp. 313, 317 (D.Md. 1990)

*Williams v. Long,* 585 F. Supp. 679 (D. Md. 2008)

*Wyeth v. Levine*, 555 U.S._____ 2009

**Statutes**

*Maryland Annotated Code, Courts & Judicial Proceedings*, Section 5-405(b)(5)

**Other Authorities**

Guide to Legal Aspects of Doing Business in Maryland, Douglas F. Gansler, Attorney

General (February 2009).

*Maryland Pattern Jury Instructions*

*Pleading Causes of Action In Maryland, 2nd Edition*, Paul M. Sandler & James L.
Archibald, 20-225, MICPEL (1998)

*Second Restatement of Torts* §402(A) (1965)

*Second Restatement of Torts* §402(A) (1965)

*W. Page Keeton et al., Prosser and Keeton On the Law Of Torts 727* (5th ed. 1984)

**Preliminary Statement**

The defendants, Johnson & Johnson, Centocor Inc., and Amerisourcebergen Drug

Corporation, through common design, engaged in a civil and criminal conspiracy

by failing to secure proper licensing for distribution of biological drugs, intentional

misrepresentation, defective marketing, fraud,  breaches of warranties, design defect and

were negligence with respect to meeting the customers expectations on an objective

standard, all which lead to the death of an otherwise healthy Crohn's patient who was

only 26 years of age.

In 1998, Remicade was first introduced into the marketplace for the treatment of

moderate to severe Crohn's for the reduction of the signs and symptoms ( Exhibit 1).

"Crohn's disease is a chronic inflammatory condition of the gastrointestinal tract that

affects adults and children, males and females alike, and can occur anywhere from the

mouth to the anus. The inflammation that occurs often involves the entire wall of the

gastrointestinal tract which can result in abdominal pain, gastrointestinal tract bleeding,

diarrhea or loose stools, strictures (blockages) and infections (Exhibit 2). The disease

often results in flare-ups; the defendants marketed and distributed Remicade as a

drug that was "clinically proven to put Crohn's into remission and help keep it there."

The defendants stated that "Living without flare-ups is possible with REMICADE" and

that  with Crohn's  "typically it leads to persistent diarrhea, abdominal pain, fever,

**and  at times, rectal bleeding**." ( Exhibit 3). Centocor and Johnson

6

set up a marketing scheme whereby physicians could receive substantial payment and

other gratuities for ordering Remicade ® for patients. The press release on October 12,

1998 quoted Vice Presidnet  James Schoeneck who stated "Centocor will sell Remicade®

to wholesalers and distributors at a list price of $450 per vial and the average patient will

require 3 to 4 vials of Remicade ® per infusion."   Remicade market price was

approximately $800 at the time of the press release (Exhibit 1). Remicade, a fast track

Drug, was the first pharmaceutical product in Johnson & Johnson's 110 year history to be

directly associated in the marketplace with the parent company of Centocor

Inc. (Exhibit 4).  To increase profits, the marketing staff  was trained to overcome

physician objections to prescribing  Remicade including objections to the safety
concerns.

(Exhibit 5). Profits for Remicade soared with sales in 2006 of $ 3.77 billion (Exhibit 6).

Medicaid and Medicare patients were specifically targeted as the government reimbursed

100% of the drug costs. The DTC/DTP campaign "Goal=Get Patients Asking for

Remicade was working." (Exhibit 7). Sales reps were engaging in illegal marketing

practices including advising healthcare providers to round off dosage amounts of the drug

(Exhibit 8, Exhibit-9, 10- Expert Report and Rebuttal Report of James Thomas

O'Donnell without exhibits).

    The greed, marketing schemes, and kickbacks provided by these defendants garnered

the attention and review of the United States Attorney's Offices, States Attorney

Generals, and other federal and state agencies across the nation  (Exhibit  11). When

employees  blew the whistle on the activities, the alleged that they were fired for doing

so. (Exhibit 12, 13). The defendants sought to control the safety perceptions among

7

"customers," even in light of critical articles published by peer-review journals ( Exhibit

13). Defendants, in order to exercise even greater control over healthcare providers,

conducted in house local training for nurses and physicians ( Exhibit 14). In fact, they

controlled and influenced the entire market for Remicade therapy process by ensuring
that the medication was approved (although the required information for Crystal Mack in

this case was blank) and setting up shell companies such as the Lash Group that appeared

independent. Lash Group Inc was a specialty company of  Amerisourcebergen  and was

operated as "Accessone" a Centocor support system to insure that the patients kept

appointments and continued on the therapy ( Exhibits 15, 16, 17, 18).

The Defendants were so blatant in the marketing and distribution of Remicade

to achieve soaring profits that they often ignored state laws, including several laws set up

to protect customers in the State of  Maryland. In the instant case, Amerisourcebergen

failed to have a proper distribution license verified by the Maryland Board of Pharmacy

in 2006 and 2007 when it distributed Remicade to Crystal Mack. This failure to abide by

Maryland law is a criminal offense and in violation of the state Medicaid laws (Exhibit

19).

Although Remicade continued to be marketed by these defendants under the halo of

an effective drug, many patients who were ordered the drug started dying and suffering

other events associated with the drug (Exhibit 20). Patients in a clinical study died of

cardiac arrest as a result of the therapy (Exhibit 21). Remicade has been the subject of

numerous box black warnings since it has been introduced into the market. A black box

is the Federal Drug Administration's strongest warning.  Thus far, the warnings have

been:

8

* March 1999 Package Insert: A warning on hypersensitivity
* November 1999 Package Insert: A warning on the risk of infection
* December 2000 Package Insert: A warning on neurological events and warning on the risk of infections.
* August 2001 Package Insert: A boxed warning on the risks of infection.
* March 2002 Package Insert: A warning on and contraindication in patients with congestive heart failure
* June 2004 Package Insert: A warning on henatologic events
* October 2004 Package Insert: A warning on malignancies
* December 2004 Package Insert: a warning on hepatotoxicity
* May 2005 Package Insert: An additional warning on the risks of infection
* May 2006 Package Insert: A boxed warning on hepatosplenic t-cell Lumphomas
* September 2006 Package Insert: A warning on hepatitis B virus reactivation.(Exhibit 9).

In the instant case, the discovery highlighted in opposition to Defendants' motion will show that Crystal Mack, a patient suffering from inflammatory bowel disease which was believed to be Crohn's disease, was 26 years female when she was ordered Remicade by Dr. Lisa Pichney (her treating gastroenterologist) at the request of James Mack, her father. James Mack had been informed by his physician that Remicade was known to be effective in treating the symptoms that Crystal Mack was experiencing (Exhibit 21- Complaint, Exhibit 22 Report of Donald Harvey Marks, M.D. PH.D without  exhibits, Rebuttal Report 23).Unknown to James Mack, Remicade was to be prescribed only after conventional therapy had failed as this was the indication based on how the drug was studied and approved by the Federal Drug Administration  (Exhibit 24). Dr. Pichney, who had been treating Crystal Mack for less than six months for her Crohn's, ordered the drug because Crystal Mack could not swallow pills on Entocort.

Shortly after starting the drug Crystal Mack was seen at the emergency room for symptoms that have been associated with adverse events with Remicade. According to Dr. Pichney and her family members in the home where Mack resided, she

experienced "slight bleeding"  related to her inflammatory bowel disease. While in

Dr. Pichney's care Crystal Mack received two infusions of blood in approximately

a year which was not unusual. Dr. Pichney felt that Crystal was doing well, was well

aware of her conditions,  and was bright and intelligent .( Exhibit 25).

On April 17, 2009, Crystal Mack experienced a ventricular fibrillation arrhythmia

which caused her death.  The v-fib was confirmed by ECG by the ambulance attendants

who responded to the home of the Macks and the emergency room at Northwest Hospital

where she was transported arriving in a matter of minutes. (Exhibit 26, 27).  Sylvia Mack

testified that Crystal Mack was upstairs in her home and called for her sister who

responded immediately. Sylvia then immediately went upstairs where her daughters

were and Crystal Mack was on the floor and appeared unconscious. Crystal Mack then

was responsive, spoke to her family and requested medication and then seconds later was

unresponsive ( Exhibit 28- Videotaped Deposition of Sylvia Frances Stewart-Mack,

March 19, 2009). Crystal Mack's body was transported to the Office of the Medical

Examiner because she was a healthy individual who was not expected to die

according to J. Laron Locke, the assistant medical examiner. Dr. Locke's deposition

testimony will be fully reviewed below. Dr. Pichney, Crystal Mack's gastroenterologist,

was surprised that Mack died and in all her years of treating Chron's patient had

never had a patient to die from the reasons for death found by the medical examiner

primarily "intestinal bleeding." ( Exhibit 25) Family members also felt that Mack was

doing well and none of them, nor her health care providers, could surmise the reason for

her death as she had no abnormalities to her heart, did not drink, or take illegal drugs.

Although Crystal Mack had received psychological treatment as a child, there was no indication that her mental condition played any role in her untimely demise. Dr. Pichney was aware of the history and would not have treated her differently.

Plaintiffs' experts in reviewing the case reached the conclusion based on general causation and specific causation that Remicade, of which she had received four Infusions, caused or contributed to the cardiac arrhythmias that caused her death based on differential diagnosis and a review of manufacturer labeling (Exhibit 29, 30), adverse reports, case reports, a clinical study ( Exhibit 31- "Acute Risk during Acute Infusion of Infliximab: A Prospective, Single -blind, Placebo-controlled, Crossover Study in Patients with Chronic Arthritis by Lazzerini), a review of the clinical history, and the evidence on autopsy . As a result of the Lazzerini study, Centocor and Johnson & Johnson convened a high level meeting of the Cardiovascular Safety Group on January 12, 2009 ( Exhibit 31 b).

There was and remains no evidence that Crystal Mack suffered a massive intestinal bleed that led to her death. There was and remains no evidence that Crystal Mack slowly bled to death or suffered anemia which lead to her cardiac arrest under the watchful eye of her treating internal medicine physician, gastroenterologist, and family as poised by the defendants experts (Exhibit 22,23, Exhibit 24, Exhibit 32- Expert Report and Rebuttal Report of William L. Manion, MD, PhD,).

The defendants' experts accepted that "intestinal bleeding" caused the death of Crystal Mack and that diabetes was a contributing factor. (Exhibit 33- Dr. Raymond Cross,  Exhibit 34- Report of Dr. Barbara G. Matthews,  Exhibit -35 Report of Dr. David Sachar).

11

As will be fully discussed in this opposition,  Dr. Locke of the Office of the Medical

Examiner is not board certified in any field of pathology and opined in Ms. Mack's case

for the first time out of 7000 autopsies that a patient died of "intestinal bleeding" as a

result of inflammatory bowel disease . Dr.Locke testified that while "diabetes mellitus"

was stated as "a contributing factor" in the autopsy, it was listed simply because of

the patient's history and not because it contributed to her death.

The Plaintiffs have plead Strict liability - Count I,  Misrepresentation- Count II ,

 Breach of Warranty- Count  III, Negligent Design, Negligent Manufacture -Count IV,

- Breach of Contract- V, Civil Conspiracy, and survival actions on behalf of James Mack

and Sylvia Mack- VI, VII. Plaintiffs have plead and proven personal injury and economic

damages (Exhibit 21, Exhibit 21a, 21b, 21c).

The Plaintiffs will convince this Honorable Court that the Defendants are

not entitled to summary judgment as a matter of based on the pleadings, answers to

interrogatories, deposition testimony and expert reports, and other probative discovery in

this action.

### Summary Judgment

 Summary judgment is proper if the evidence before the Court establishes that

there is no genuine dispute as to any material fact and that the moving party is entitled

to judgment as a matter of law. Fed.R.Civ.P 56 (c ); Celotex Corp. v. Catrett, 477 U.S.

317, 322 (1986); May v. Roadway Express, Inc., 221 F. Supp 2d. 623, 626-27 (D. MD

2002) (Nickerson, J.). Summary judgment must be entered against a party who, after

reasonable time for discovery and upon motion, "fails to make a showing sufficient

to establish the existence of an element essential to the party's case, and on which that

12

party will bear the burden of proof at trial." <u>Celotex</u> 477 U.S. at 322; <u>May,</u> 221 F. Supp

2d at 626. "[A] complete failure of proof concerning an essential element of the non-

moving party's case necessarily renders all other facts immaterial [and] [t]he moving

party is "entitled to judgment as a matter of law." <u>Celetox,</u> 477 U.S. at 323 (citations

omitted); <u>May,</u> 221  F. Supp.2d at 626.

   At the summary judgment phase, the Court views " the evidence and all

Justifiable inferences in the light most favorable to the party opposing the motion." <u>May,</u>

221 F. Supp.2d at 627 (citing <u>United States v. Diebold, Inc.,</u> 369 U.S. 654, 655 (1962)

(per curiam). Evidence favoring the non-moving party that is "merely colorable" and

lacking "significantly probative" value, however, cannot defeat summary judgment.

<u>Anderson v. Liberty Lobby Inc.,</u> 477 U.S. 242, 249-50 (1986);<u>May,</u> 221 F. Supp. 2d at

627-27. Similarly, a non-moving party cannot overcome summary judgment by relying

on "[un] supported speculation." <u>May,</u> 221 F. Supp. 2d at 627. (citing <u>Felty v. Graves-</u>

<u>Humphreys Co.</u> 818 F. 2d 1126, 1128 (4th Cir. 1987). Even the existence of "some

dispute" does not warrant denial of summary judgment unless that dispute creates a

"genuine issue of material fact." *Id.* (citing <u>Anderson,</u> 477 U.S. at 247-48) A factual

dispute is "material" only if it involves "facts that might affect the outcome of the case

under the governing law." <u>Id.</u>

   The instant action was removed  based on diversity of citzenship. The landmark

decision of *Erie R.R. v. Tompkins*  304 U.S. 64, 58 S. Ct. 817, 82 L. Ed 1188 (1938),

provided that there was no federal common law, thus state law must be applied in

diversity actions in federal courts not involving federal statutory or specific common law

13

(I.e., admiralty). Maryland follows the traditional *lex loci delicti* rule. Under this principle, the substantive rights of the litigants are determined by the law of the place of the wrong.  This place is where the injury was suffered. This rule has been applied in products liability actions brought in Maryland.  *Rockstroh v. A.H. Robins.*, 602 F. Supp. 1259 (D. Md. 1985). Maryland law controls the inferences to be drawn from the evidence, the sufficiency of the evidence, the inferences from it to go to the jury, and other procedural matters. *Joffre v. Canada dry Ginger Ale, Inc.,* 222 Md.1, 158 A.2d 631 (1960).

### Statement of Undisputed Material Facts

The core, undisputed facts provide the basis for the Plaintiffs Motion in Opposition to Defendants' Motion for Summary Judgment:

1.     Defendant Amerisourceberen Drug Corporation was not licensed in the State of Maryland as a distributor in 2006 and 2007 when it distributed Remicade manufactured and marketed as the pharmaceutical drug of Defendant Johnson & Johnson and Centocor Inc., which was a violation of the Annotated Code of Maryland Section 12-602.

2.     Defendants Centocor Inc., and Johnson & Johnson were not licensed to do business in the State of Maryland in 2006 and 2007.

3.   Defendants were required to be in compliance with all Maryland laws to receive Medicare payments for the Remicade distributed to Crystal Mack.

4.   Defendants engaged in marketing to increase sales and market share by

14

direct marketing to customers ordering Remicade for their patients which was ongoing at

the time that Crystal Mack was ordered Remicade.

5.   There is no clinical evidence that Crystal Mack suffered a massive bleed..

6.   Remicade® cannot be ruled out as the cause of Crystal Mack's sudden cardiac

death from an arrhythmia as opined by the plaintiff's expert witness and confirmed by

Dr. Raymond Cross, Associate Professor at the University of Maryland, a treating

gastroenterologist, and the defendant's expert witness.

7.   Arrhythmias were reported to occur in patients in clinical studies evaluating

Remicade as reported by defendants' expert Barbara Matthew who worked at the

FDA and who reviewed the license application for Remicade.

8. The labeling of Centocor expressed that arrhythmias are an adverse event

associated with Remicade.

9. The video "On My Own Terms" prepared by Defendants Centocor Inc., and

Johnson & Johnson and presented to Crystal Mack for viewing before her first

Remicade infusion did not present any testimonials by patients for whom

treatments had not resulted in a favorable clinical response.

10. Johnson & Johnson marketed Remicade as its' pharmaceutical drug.

15

11.  Crystal Mack entered into a contract with the Lash Group which is

a company owned and operated by Defendant Amerisourcbergen Drug Corporation.

Further undisputed material facts will be integrated into the arguments as necessary

below including Crystal Mack' relevant medical history.


**Argument**

*Violation of Statu*es

DEFENDANTS DID NOT POSSESS THE REQUIRED LICENSURE IN THE

STATE OF MARYLAND TO DISTRIBUTE REMICADE, OPERATE AS A FOREIGN

CORPORATION IN THE STATE OF MARYLAND, OR RECEIVE PAYMENT FOR

REMICADE SOLD TO CRYSTAL MACK AS A MEDICAID PATIENT.

The Plaintiffs have produced in discovery the certified true test record from the

Maryland Board of Pharmacy that states that AmeriSourceBergen closed in Maryland on

May 12, 2003 ( Exhibit 19). This record is admissible and conclusive on this issue.

> **Article-Courts and Judicial Proceedings Section**
> (a)  A copy of a public record, book, paper, or proceeding of any agency of the
> government of the United States, the District of Columbia, any territory or
> possession of the United States, or any state or any of its political subdivisions
> or of an agency of any political subdivision shall be received in evidence in any
> court if certified as a true copy by the custodian of the record, book, paper, or
> proceeding, and if otherwise admissible.

The Plaintiffs have also produced the online licensure inquiry for

Amerisourisourcebergen Drug Corporation. Printed web pages from governmental

16

Internet sites are self-authenticating and do not require extrinsic evidence to show that they are what they purport to be. *Williams v. Long,* 585 F. Supp. 679 (D. Md. 2008). (Exhibit 36).

The certification is to be given more weight than the affidavit and purported licenses attached to Defendant' motion to posit that this defendant was in fact licensed when Remicade was distributed in 2006 and 2007, the relevant time period during which Crystal Mack received Remicade at the Serpick Infusion Center at St. Joseph Hospital.

In the event of a dispute between the affidavits offered by the opposing parties, the Court is obligated to resolve the conflict in the light more favorable to the plaintiff. *Carey v. Fiberfloat Corp.,* 849 F. Supp. 423, 425 (D. Md 1994). Mark Frankosky, the 30 (b) (6) designee of defendant Amerisourcebergen Drug Corporation did not check with the Maryland Board of Pharmacy to ensure that the licenses at their corporate office in Chesterbrook, Pa were authentic. The licensure of this defendant was properly noticed. (Exhibit 37, Exhibit 38- Deposition of  Mark Frankosky, May 1, 2209 at p. 29 L. 1 - 37 2). Frankosky also testified that Steve Lord and Kelly Buckson were Amerisourcebergen sales representatives who were responsible for St. Joseph Hospital from 2006 until 2008 and further that Centocor conducted sales activities in the State of Maryland during that time. ( Id., Frankoksy p. 38).

Johnson & Johnson and Centocor are not licensed to do business in the State ( Exhibit 39).   The Maryland Attorney has issued an opinion stating that "if a foreign corporation wishes to engage in interstate or foreign business operations in Maryland, it must Register."(Exhibit 40, "Guide to Legal Aspects of Doing Business in Maryland").

17

This fraudulent activity is an intentional misrepresentation and James Mack testified in his deposition and stated in his affidavit that he would not have discussed Remicade with his daughter had he known that the defendants were not acting in accordance with state laws ( Exhibit 24). The Wholesale Distribution Permit and Prescription Drug Integrity Act became law in 2008 and neither are applicable to this action (Exhibit 19).

These defendants have a pattern and practice of violating state laws and engaging in unfair and deceptive marketing practices. Their actions include the following which were referenced in documents produced during discovery in this action:

1. On August 18, 2003, the U.S. Attorney for New Jersey opened an investigation into Centocor's Marketing Practices ( Exhibit 41).

2. On March 3, 2005,  United States Department of Health h and Human Resources reported a subsidiary of Amerisourcebergern agreed to pay $5,975,000 related to provisions applicable to kickback.

3.On August 25, 2007, Amerisourbergen announced that the U.S. Drug Enforcement Administration reinstated its distribution license in Orlando . The license was suspended because the company did not maintain effective controls against diversion of controlled dangerous substances.

4. On November 27, 2007, the Office of the State attorney for the Central District of California issued a subpoena in connection with a probe into pricing to Centocor related to Remicade.

5.Reported on February 27, 2009 that AmerisourceBergen Corp and others were sued in a whistleblower lawsuit in the U.S. District Court of Massachusetts for improperly marketing Ananesp. It was alleged that customers were told that they could profit for prescribing the drug.

6.On March 3, 2009, a judge ordered that Johnson & Johnson & Johnson and its Janssen Pharmaceutical unit pay West Virginia $ 3.95 million for misleading doctors about the risk and benefits of the antipsychotic drug Risperdal. The lawsuit was brought by the West Virginia Attorney General.

7. On March 20, 2009 Dr. Joseph Biederman of Harvard University became a witness against Johnson & Johnson as the company is alleged to have defrauded state Medicaid programs by improperly marketing their medicines to

increase sales.

John Murray, the former Director of Market Compliance for Centocor testified

that all of the government investigations related to marketing compliance. (Exhibit 42,

Deposition of John Murray, May 8, 2009 p. 10).

*Civil Conspiracy*

DEFENDANTS FAILURE TO POSSESS THE REQUIRED LICENSURE WHILE
DISTRIBUTING REMICADE IN MARYLAND, DOING BUSINESS IN
MARYLAND, RECEIVING PAYMENT FROM CRYSTAL MACK AND ENGAGING
IN MISREPRESENTATION CONSTITUTED A CIVIL AND CRIMINAL
CONSPIRACY WHICH IS REFLECTIVE OF A NATIONAL PATTERN OF
CONDUCT FOR THESE DEFENDANTS.

The elements of an action for civil conspiracy are (1) a confederation of two or more

persons by agreement or understanding, (2) some unlawful or tortuous act done in

furtherance of the conspiracy or use of unlawful or tortuous means to accomplish an act

not in itself illegal; and (3) actual legal damage resulting to the plaintiff. *Van Royen v.*

*Lacey,* 262 Md, 94, 98, 277 A,2d 13, 14 (1971). Although some unlawful act must

be committed in furtherance of the agreement, each member of the alleged conspiracy

sought to be held liable is not required to have personally committed or joined in

committing the act. *Allen v. Bethlehem Steel Corp.,* 76 Md. App. 642, 547 A. 2d 1105,

*cert denied,* 314 Md. 458, 550 A. 2d 1168 (1988). An unlawful act, as employed in a

civil conspiracy context, connotes a tort, a breach of contract or other actionable wrong.

*Columbia Real Estate Title Ins. Co. v. Carusco,* 39 Md. App. 282, 288 A. 2d at 472.

Because of the difficulty in proving a conspiracy by direct evidence, a conspiracy may

be proved by circumstantial evidence. *Daughtery v. Kessler,* 264 Md. 281, 286 A. 2d 95

(1972). A conspiracy may be shown by inferences drawn from the nature of the acts

19

complained of, the individual and collective interest of the alleged conspirators, the situation and relations of the parties, their motives and all the surrounding circumstances preceding and attending the culmination of the common design.  *Id* at 292, 286 A. 2d at 101.

The material facts as stated in the preliminary statement and undisputed material facts supports that (1) the defendants and each of them participated in marketing Remicade in violation of Maryland law and a result, Ms. Mack suffered economic and physical injury. As conspiracy is not actionable unless asserted in a civil wrong, Plaintiffs will discuss additional proven facts and violations of their rights below.

*Fraud and Misrepresentation*

DEFENDANTS ENGAGED IN A MARKETING SCHEME INVOLVING FRAUD AND MISREPRESENTATION THAT INDUCED CRYSTAL MACK TO RECEIVE REMICADE.

The tort of fraud or deceit occurs when one is intentionally deceived by another's representations about the existence or absence of material facts and when, upon justifiably relying on the representations, the victim incurs damage. See *W. PAGE KEETON ET AL., POSSER AND KEETON ON THE LAW OF TORTS 727 (5th ed. 1984).* The allegations required to properly plead the cause of action known as intentional misrepresentation are: (1) The defendant asserted a false representation of a material fact to the plaintiff; (2)The defendant knew that the representation was false, or the representation was made with such reckless disregard for the truth that knowledge of the falsity of the statement can be imputed to the defendant; (3) The defendant made the statement for the purpose of defrauding the plaintiff; (4) The plaintiff relied with

20

justification upon the misrepresentation; and (5) The plaintiff suffered damages as a direct result of the reliance upon the misrepresentation. *Alleco v. The Harry and Jeanette Weinberg Foundation,* 340 Md. 176, 665 A. 2d 1038 (1995). Alleging and proving fraud in the inducement do not require a stringent standard of actual malice; alleging and proving implied malice will suffice. Fraud in the inducement occurs when one has been led by the guile of another into an agreement to his or her detriment. *See, e.g. Security Constr. Co v. Maietta,* 25 Md. App. 303, 334 A.2d 133 (1975).

Intentional misrepresentation, sometimes referred to as non-disclosure, is that branch of misrepresentation which involve concealment of material facts with intent to deceive. *See Gross v. Sussex Inc.,* 332 Md. 247, 630 a. 2d 1156 (1993). The elements of this tort are: (1) Duty to disclose; (2) Failure to disclose a material fact; (3) With the intent to deceive, I.e., the defendant knows the plaintiff would act in a different manner had he or she known of the existence of the undisclosed fact; (4) The plaintiff acts in justifiable reliance upon the concealment; and (5) The plaintiff suffers damages as a result of the concealment.

Negligent misrepresentation provides a remedy for one acting in reliance upon a false representation by another whose conduct, in rendering the representation, was "culpably careless," but not "deliberately fraudulent." *See Giant Food v. Ice King, Inc.,* 74 Md. App. 183, 536 A.2d 1182. The elements of the tort are : (1) The negligent assertion of a false statement by the defendant owing a duty of care to the plaintiff; (2) The intention of the defendant for the plaintiff to act or rely upon the negligent assertion; (3) The knowledge of the defendant that the plaintiff will probably rely upon the negligent assertion or statement which, if erroneous, will cause damage; (4) Justifiable action by

21

the plaintiff in reliance upon the statement or assertion; and  (5) The incurring of

damages caused by the defendant's negligence. *Gross v. Sussex Inc.,* 332 Md. 247, 630

A. 2d 1156 (1993).

The Defendants  erroneously state at page 13  of the motion for summary

judgment " although not asserted in their complaint , based on  questions posed during

discovery Centocor suspects plaintiffs want to assert a fraud or misrepresentation claim."

Count II specifically plead misrepresentation and fraud in accordance with the

pleading practice of Maryland and incorporated all prior paragraphs. See  *Pleading*

*Causes of Action in Maryland* ,  *Second Edition,* Paul Mark Sandler &  James L.

Archibald at p. 200-225 MICPEL (1998).

James Mack stated in his deposition,  answers to interrogatories, and affidavit that he

discussed Remicade treatment with Crystal Mack after the drug had been recommended

by his physician.  Mack after reviewing documents and discovery has become aware that

the defendants over years by marketing scheme and misrepresentation sought to

overcome the objections to the safety concerns of physician in the medical community by

directly convincing patients to request the drug and physician to order the drug when it

was not medically necessary. ( Exhibit 7 p. 41 "Goal=Get Patients Asking For

Remicade".) Further Mack would not have discussed Remicade with Crystal Mack had

he been aware that it was therapy to be used when conventional therapy had

failed. (Exhibit 43-Deposition of Stella Jones, PHD, February 2009,   p. 28 L 10-16,

Exhibit 23, Exhibit 19, Exhibit 48 Deposition of  James Mack , March 10, 2009 p. 65-92,

Exhibit 49) James Mack learned that the authoriztion form as to medical necessity was

not completed as required with respect to dosage, duration, and other pertinent clinical

information was not completed and yet was processed for benefit approval by

Accessone. Michael Cornell, a Remicade sales representative for Centocor and Johnson

& Johnson had 3 weeks of in home training and 2 weeks on the job training before he

started making sells calls on healthcare providers (Exhibit - Deposition of Michael

Cornell, April 30, 2009, p. 25 L. 1-p. 29 L- 10) Cornell states that his "job as it was given

to me was to educate doctors about the use of Remicade in patients. He stated

that Accessone does benefits verifications for physicians (Id. at p. 32 L- 19 - 22,   P. 101

L. 3-11). Cornell serviced physicians who might refer patients to the Serpick Infusion

Center where Crystal Mack received treatment ( Id., at p. 36 L 15- L 36). Cornell did in-

service training for the nurses at the center (Id., at p.37). No medical training was

required outside of Centocor ( Id., at p. 105 L. 16- 19).   Outstanding Remicade sales by

representatives resulted in them being honored by being invited into the President's club

for a year (Id., at p. 44). Cornell indicated that he would have given the videos "On My

Own Terms," to Dr. Pichney which eventually was given to Crystal Mack by her office.

(Id., at p. 67 L. 10-p. 69-1, p. 147 L. p. 148 L. 19). Cornell was trained at the national

sales conferences on meeting the objections of physicians ( (Id., at p. 82 L-13-17, p. 94

L.94 L. 17- p. 95 L. 2) Cornell has known Dr. Lisa Pichney for over ten years as a sales

rep and purchased lunch for her office for in-service training ( p. 138 L.8- p. 142 L.  13,p.

151 L.13-18). Mr. Cornell did not think the inability to swallow a pill, as was Crystal

Mack's concern, was a failure of conventional therapy (p. 153 L 6- p. 154 L. 4). Dr.

Marks did not have a problem with the Pichney treatment  ( Exhibit  45, Deposition of

Donald Marks, April 3, 2009). Dr Locke was not asked about conventional therapy as he

23

is not a clinician ( Exhibit 46, Deposition of J. Laron Locke, June 4, 2009).

John Murray, the former Director of Marketing Compliance,  testified that Centocor

had a goal of insuring that patients demand Remicade was a strategy that "endured the

entire time he was there. Murray was an employee of Centocor from April 1st 2001 until

April 30th, 2008 ( Exhibit Murray p. 10, 57).  These act and or omisisons were

misrepresentation  (Exhibit 50).

*Contract*

PLAINTIFF MACK ENTERED INTO A LEGALLY BINDING CONTRACT WITH
DEFENDANT AMERISOURCEBERGEN AND ITS AGENT OR SERVANT
ACCESSONE, THE CONTRACT WAS SUPPORTED BY CONSIDERATION, AND
THE CONTRACT WAS BREACHED

To maintain a contract action in Maryland, the Plaintiff must allege 1) the existence of

a contractual obligation owed by the defendants to the plaintiffs; and 2) a material breach

of that obligation by the defendant. *Continental Masonry Co v. Verdel  Constr. Co.,*  279

Md. 476, 480, 369 A. 2d 566, 569 (1977). A form of a breach of  contract is a breach of

the implied covenant of good faith and fair dealing.  *Food Fair Stores, Inc. v. Blumberg,*

234 Md. 521, 534, 200 A. 2d 166, 174 (1964). Damages awarded to the non-breaching

party are designed to put that party in the same position that he or she would have been

had the contract been performed. *Stone v. Chicago Title Ins. Co.,* 330 Md. 329, 338-42,

624 A. 2d 496 (1993). Finally," a party to a contract which has been broken may recover

nominal damages of $1.00 even though he fails to prove that he suffered actual

damages." MPJI No. 10:10. Crystal Mack received Medicaid benefits in part for her and

treatment as a result of the Defendant Centocor Inc., and Accessone breach of the written

contract. Payment made by paid by Medicaid for her medical treatment resulting from the breach of contract must now be repaid to the State Of Maryland Department of Health and Mental Hygiene pursuant to  Paragraph B of Health-General Code Section 15-120 Payment by a collateral source to plaintiff for items of damage cannot be set up by the wrongdoer in mitigation or reduction of damages. *Haischer v. CSX Transp.,* 381 Md. 119, 848 AQ. 2d 620 (2004).

Plaintiffs allege that Crystal Mack was required to sign a contract with the Lash Group on September 9, 2006 which administered AccessOne. AccessOne's purpose was to provide assistance in qualifying patients for Remicade ® treatments. (Complaint paragraph 7). See also Count IV alleging Breach of Contract.

John Murray testified that he recalls as a compliance officer for Centocor that he approved  "communications, procedures and forms and things like that that were used by Accessone." ( Murray p. 17). Murray approved the form that was presented to Dr. Pichney for REMICADE treatment  (Murray p. 32, 33, Exhibit 7).   John Murray confirms that the Lash Group was an Amerisourbergen  specialty company ( Murray p. 30, Exhibit 5, 6, 7).

*Breach of Expressed Warranty*

 DEFENDANTS BREACH EXPRESSED AND IMPLIED WARRANTIES;
DEFENDANT JOHNSON & JOHNSON HELD REMICADE® OUT TO THE PUBLIC
AS A DRUG MARKETED BY JOHNSON & JOHNSON.

To recover for breach of express warranty, the plaintiff must allege and prove that (1) an expressed warranty existed, (2) the product did not confirm to the warranty; and (3) that the breach of the warranty was the cause of the injury to the user or third party. *Fischbach & Moore Int'l Corp. v. Crane Barge R-14,* 632 F. 2d 1123, 1125 (4th Circuit).

25

Express warranties may consist of any affirmation on fact, promise, description, sample, or model which is made a basis of the bargain between the seller and buyer. See Md. Code Ann., Com. Law I Section 2-313 (Repl. Vol. 1997). The existence of an express warranty is generally a question of fact for the jury. *Barb v. Wallace,* 45 Md. App. 271, 278-81, 412 A. 2d 1314, 1318-19 (1980).  Privity is not required for breach of contract where personal injury is claimed. See Md. Code. Ann., Com. Law I Section 2-318 (Repl.Vol. 1997). It is unnecessary for anyone other than a direct buyer to allege and prove notice in a breach of warranty claim. *Firestone Tire & Rubber Co. v. Cannon,* 53 Md. App. 106, 452 A. 2d 192 (1992), aff'd, 295 Md. 528, 456 A. 2d  1930 (1993). Two separate and distinct implied warranties may arise from the sale of goods; an implied warranty of fitness for a particular purpose and an implied warranty of Merchantability. These warranties may sometimes overlap and both may  be breached by the same occurrence. *Thomas v. Ford Motor Credit Co.,* 48 Md. App. 617, 429 A. 2d 277 (1981). To recover under either of these theories, the plaintiff must show that:  (1) a warranty existed, (2) the product did not conform to the warranty; and (3) the breach of warranty by the seller was the cause of the injury to the user or third party *Bond v. Nibco, Inc.,* 96 Md. App. 127, 138-39, 623 A. 2d 731, 737 (1993).  Unlike express warranties and implied warranties of fitness for a particular purpose, implied  warranties of merchantability do not require privity between buyer and seller even if the action involves only economic loss. *Copiers Typewriters Calculators, Inc, v. CMI Corp.,* 651 F. Supp. 641, 649 (D. Md. 1986).

   AccessOne on behalf of the defendants undertook the obligations to advise Crystal

26

Mack of the risks and benefits of Remicade treatment, although not a health care

provider.  Plaintiffs further discussed warranties in body of opposition and exhibits.

*Products Liability- Design Defect,  Defect in Manufacture,  Negligence*

To prevail in a strict liability claim in Maryland, one must prove (1) the

product was in a  defective condition at the time that it left the control or possession of

the seller, (2) that the product was unreasonably dangerous to the consumer, (3) the

product was expected and did reach the consumer without substantial change in its

condition ; and (4) the defect in the product was the proximate cause of the plaintiff's

injuries. It may be defective  (a) in manufacture; (b) in design; or (c) by failing to have

adequate warnings or instructions- the absence of which are deemed to leave the product

defective. *Phillips v. General Motors Corp.,* 278 Md. 337, 344, 363 A.2d 955, 958

(1976).  Section 402  of the Restatement requires the product to reach the user "without

substantial change in the condition in which it was sold. Not every change made

to a product will preclude liability. RESTATEMENT (SECOND OF TORTS SECTION

402A (1965). The substantiality of such changes and whether third parties have become

superseding causes are generally questions of  fact for the jury. *Ellsworth v. Sherne*

*Lingerie, Inc.,* 303 Md. 581, 495 A. 2d 348 (1985). One test, known as the "consumer

expectation test" "focuses on whether" the product is, at the time it leaves the seller's

hands, in a condition not contemplated by the ultimate consumer, which will be

unreasonably dangerous to him. *See Kelley v. R.G. Indus., Inc.,* 304 Md. 124, 497 A. 2d

1143 (1985). In product liability cases the equivalent of the evil motive, intent to defraud,

or intent to injure, which generally characterizes actual malice is (1) the defendant

actually knew of the defective and dangerous condition of the product at the time that it

27

left the defendant's possession or control; and (2) armed with this actual knowledge, the defendant consciously or deliberately disregarded the potential harm to consumers. *Owens-Illions, Inc. v. Zenobia,* 325 Md. 420, 601 A. 2d at 653. The test requires a bad faith decision by the defendant to market a product, knowing of the defect and danger, in conscious or deliberate disregard of the interest to the safety of the consumer. *Zenobia,* 325 Md. At 463 Md. At 463, 601 A. 2d at 654.

Strict liability is "negligence per se, in that it is a judicial determination that placing a defective product on the market which is unreasonably dangerous to a user or consumer is itself a negligent act sufficient to impose liability on the seller. For recovery, it must be established that (1) the product was in a defective condition at the time it left the  possession or control of the seller, (2) that it was unreasonably dangerous to the user or consumer, (3) the defect was a cause of the injuries, and (4) that the product was expected to and did reach the consumer without substantial change in its condition. *Phillips V. General Motors Corp,* 278 Md. At 351, 363 A. 2d at 962. Strict liability covers all products.  *see RESTATEMENT (SECOND) OF TORTS SECTION 402A (1965).* The release of a product into the stream of commerce meets the "sale" requirement of Section 402A. *Giant food , Inc. v. Washington Coca-Cola Bottling Co,* 273 Md. 593, 602-07, 332 A.2d 1, 7-10 (1975). Middlemen or other regular intermediate sellers of a defective product may be strictly liable to the plaintiff just as the manufacturer may be liable. *Adams v. Owens-Illinois, Inc.,* 119 Md. App. 395, 411-12, 705 A.2d 58, 66-67 (1998). In Maryland, a defect is predicated on evidence of defect, rather than on evidence of negligent conduct. *See Philips,* 278 Md. At 344, 363 A., 2d at 958. Maryland

28

defines a defective condition as one "not completed by the ultimate consumer."

*Ellsworth v. Sherne Lingerine, Inc.,*  303 Md. 581, 591, 495 A2d. 348, 353 (1985).

Md. Pattern Jury Instruction 26:12 states, " a product is in defective condition when, at the time the product left the seller's hands, it was in a condition not contemplated by the ultimate consumer which was unreasonably dangerous to the consumer. A product is an unreasonably dangerous product when it is dangerous to an extent beyond that which would be contemplated by the ordinary consumer with the ordinary knowledge common to the community as to its characteristics." A design defect claim assumes that the product performed as intended by the manufacturer and as per the design specifications. The issue is whether, when the product performed as designed, the product nonetheless was defective because the manufacturer's decision embodied in the design resulted in a defective product. In *Kelly v. R.G. Indus., Inc.,* Maryland held that the consumer expectation test, and not the risk utility test, is the primary standard for determining design defect.  304 Md. 124, 487 A. 2d 1143 (1985).  A product is unreasonably dangerous when it is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with knowledge common to the community as its characteristics.  *Ellsworth v. Sherne Lingerie, Inc.,* 303 Md. 581, 591, 495 A. 2d 348, 353 (1985). To establish proximate causation in Maryland, plaintiff is required to introduce evidence that which allows a jury to conclude, "that it is more likely than not the conduct of the defendant was a substantial factor in bringing about the result." *Marder v. G.D. Searle & Co.,* 630 F. Supp, 1087 (D. Md. 1986). In establishing causation under Section 402 A, plaintiffs must show that they used the product in a reasonably foreseeable manner. *Ellsworth v, Sherne Lingerie, Inc.,* 303 Md. 581, 595-97, 495 A. 2d

29

348, 355-356 (1985). Maryland permits recovery for bodily injury and property damage.

*A.J. Decoster Co. v. Westinghouse Elec. Corp.,* 333 Md. 245, 260, 634 A. 2d 13330, 1337

(1994) . Section 402B of the RESTATEMENT  (SECOND) OF TORTS provides strict

liability for the mislabeled goods which cause physical harm to the user:

> "One who in the business of settling chattel, who, by advertising, labels,
> or otherwise, makes to the public a misrepresentation of a material fact
> concerning the character or quality of a chattel sold by him is subject
> to liability for physical harm to a consumer of the chattel caused by
> justifiable reliance upon the misrepresentation even though (1) it is
> not fraudulently or negligently, and (2) the consumer has not brought
> the chattel from or entered into any contractual relations with the seller.

The Fourth Circuit applying Maryland law has limited the scope of a prescription drug

and medical device manufacturers' s duty to warn. In such situations, the duty to warn

extends only to the prescribing physicians, not to the patients. *Brooks v. Medtronic.,*  750

F. 2d 1227 (4th Cir. 1984).  Objections to the admission of recall letters issued by

manufacturers on grounds of hearsay have been rejected, with most courts finding the

letters constitute party admissions of the manufacturers. *Higgins v. General Motors*

*Corp.,* 465 S. W. 2d 898 (Ark.1971). Compliance with statutory or regulatory

requirements does not prevent a findings of negligence or strict liability in Maryland .

*Dudley V. Baltimore Gas & Elec Co.,* 98 Md. App. 182, 632 A. 2d 492, 497 (1993). The

federal courts have held that compliance with statutory standards does not preclude

liability in a products liability case. *See, e.g., Welsh v. Century Products, Inc.,* 745 F.

Supp. 313, 317 (D. Md 1990).

The Defendant, in an effort to escape the existing law, states that a risk/benefits test

must be applied to this instant case based on 21 C.F.R. Section 601.41. Further, the

Defendants states that "Indeed , the Restatement of Law Third, Torts: Products Liability provides the medicine is defectively designed only if provides no benefit to any class of patients." The Defendants cite to not a single case for either of these proposition, quite simply because this is not the law. Neither the Court of Appeals of Maryland  nor the Court of Appeals has yet adopted the provisions of the restatement.  In fact, the Court of Appeals states in *Hilliday v. Strum, Ruger & Co.,*  368 Md. 186, 209, 792 A. 2d 1145 (2002), that "[G]iven the controversy that continues to surround the risk-utility standard articulated for design defect cases in section 2 of the RESTATEMENT (THIRD), we are reluctant at this point to cast aside our existing jurisprudence in favor of such approach on any broad general basis."

   Without the support of any law the defendants further contend that, " Thus, any argument that Remicade ® is inherently dangerous is precluded , as a matter of law, by FDA's continued reaffirmance of its safety."  Such a contention is in direct conflict with the products liability law of Maryland and federal law. As the Supreme Court of the  United States stated in *Wyeth v. Levine,* 555 U.S._____ 2009 at p. 17,   " Congress  did  not provide a federal remedy for consumers harmed by unsafe or ineffective drugs in the 1938 statue or in any subsequent amendment. Evidently, it determined that widely available state rights of action provided appropriate relief for injured consumers." In 1997, Congress pre-empted certain state requirements concerning over-the-counter medications and cosmetics but expressly preserved  products liability actions. See 21 U.S.C. Section 379 (e) , 379s (d) ("Nothing in this section shall be construed to modify or otherwise affect any action or the liability of any person under the product liability law of any State.")

31

The Plaintiffs plead the elements of defect in Remicade (Complaint paragraph 15). Defendants knew that Remicade ® was dangerous because patients experienced serious and often fatal adverse events  and the defendants had knowledge of the risks before the drug was marketed. Further it was plead that, " because Remicade ® is a combination of human and mouse antibodies, many patients must also take methotrexate to prevent their immune system from rejecting the drug (Complaint paragraph 16).  Defendants knew of the product defect related to cardiovascular risk in October 2001 when a "Dear Dr. Letter" was sent to physicians warning to discontinue treatment in patients with congestive heart failure. The clinical studies showed that seven of 101 patients treated with Remicade died compared too no deaths among the patients on the placebo. (Complaint paragraph 19, 20). On April 16, 2007, another letter was sent warning of heart failure. (Complaint paragraph 21). Defendants are strictly liable in that Remicade was unreasonably dangerous when given to patients with any heart condition and Crystal Mack (Count  paragraph 49).

The Sealed Container Defense, codified as Cts. & Jud. Proc Section 5-405 is not available to defendant Amerisourcebergen Drug Corporation as contended in their motion for summary judgment as the seller engaged in civil conspiracy in distributing drugs to Crystal Mack in which the seller made express warranties through its agents, servants,  and employees at Accessone  owned by its' subsidiary Lash Group Inc. *See Cts. & Jud. Proc.  Section 5-405 (b) (5).* Although the Maryland state courts have not  yet  interpreted Section 5-405, the United States District Court of Maryland invoked the statute's reinstatement  provision in declining to accept argument by the defendants that there was

no possibility that plaintiffs could recover against distributors of cigarettes. *Richardson v. Phillip Morris, Inc.,* 950 F. Supp. 700 (D. Md. 1977). Mark Frankosky, the 30 (b) (6) designee of this defendant testimony reveals that the corporation has offices in Maryland, call on customers and assist with "anything related to what customers may have.." ( Exhibit, Frankosky, p. 17-21) This defendant also reports adverse drug reactions if known and operates a staffing office. ( Exhibit   Frankosky p. 55, p. 52).

Centocor cannot avail itself of the sealed container defense because it manufactured Remicade and further has a sales force who addressed physicians regarding the risks and benefits, and made express warranties as to the safety of Remicade. Mark Frankosky, the 30 (b) (6) of Amerisourcebergen Drug Corporation testified that Centocor was the manufacturer of Remicade. (Mark Frankosky p. 43) Moreover, Plaintiffs have alleged conspiracy and all Defendants are liable for the acts of other co-defendants in furtherance of the conspiracy.

Therefore, the Defendants' contention that Remicade benefits outweighed its risks is not the proper standard in Maryland as the Courts have continued to consistently apply the consumer expectation test.

### Express and Implied Warranty

The warranties made to Plaintiff were that Accessone would educate her regarding the use of Remicade and adverse consequences,  and establishing that the drug was a "medical necessity." (First Amended Complaint, paragraph 6). AccessOne promoted itself as a "single source support for access to infusion therapy" for Remicade.

*Johnson & Johnson Marketed Remicade and Control the Drug By Integrated Operations With Centocor*

33

John Murray testified that "Centocor is a subsidiary of Johnson & Johnson and, therefore, I was an employee of Johnson & Johnson, yes ( John Murray, p. 14) " As a part of my job, I conducted investigations under privileged with Johnson & Johnson's law department and with the compliance department." ( John Murray, p. 18).

### Medical Causation

DEFENDANTS' CHALLENGE TO THE OPINIONS OF PLAINTIFF'S EXPERT IS WITHOUT MERIT AND DEFENDANTS' EXPERTS OPINIONS AS TO POSSIBLE CAUSATION ARE NOT SUPPORTED BY THE OPINION OF THE MEDICAL EXAMINER AS HE WAS NOT QUALIFIED TO RENDER HIS OPINION AND DID NOT HAVE ANY FACTUAL, CLINICAL, OR INVESTIGATIVE SUPPORT FOR HIS CONCLUSION THAT CRYSTAL MACK DIED AS A RESULT OF "INTESTINAL BLEEDING."

*Daubert  v. Merrell Dow Pharmaceuticals, Inc,* 509 U.S. 579 (1993)  is applicable in a diversity case. *Freedman v. Case Corp.,* 118 f.3d (4th Circ. 1997). Payment of damages by a collateral source to the plaintiff for items of damages cannot be set up by the wrongdoer in mitigation or reduction of damages. *Haischer v. CSX Transp.,* 381 Md. 119, 848 A. 2d 620 (2004). A properly done "differential diagnosis" by a treating physician can be admitted into evidence on the causation of a plaintiff's condition, despite the lack of epidemiological studies or other independent data. *See Benedi v. McNeil-PPC Inc.,* 66 F. 3d 1378 (4th Circ. 1999).

### Dr. J. Laron Locke

The foundation for the Defendants contention that the death of Crystal Mack in their summary judgment motion was as a "…result of intestinal bleeding due to Crohn's disease" and that "diabetes mellitus was deemed to be a contributing factor  is based on the opinion of Dr. J. Laron Locke, the Assistant Medical Examiner

34

(See p. 4 Motion for Summary Judgment).

The defendants blindly embrace these positions in their Motion for Summary

judgment without knowledge of the lack of Dr. Locke qualifications to understand the

etiology of Crohn's, lack of knowledge of biological drugs including Remicade ®, failure

to perform a proper differential diagnosis as to cause of Crystal Mack death, and  failure

to articulate facts and events that support his opinions. Dr. Locke was disclosed as a

witness to be called by the Plaintiffs at trial during discovery. A close examination

of Locke's lack of qualifications and lack of methodology causes a domino effect on the

entire medical causation theory of the defendants, such that none of the opinions

supporting death by "intestinal bleeding" can survive.

Dr. Locke is a forensic pathologist who is not board certified (Deposition of J.

Laron Locke, M.D. p. 12, L 11-19; ), not certified in anatomic pathology, or cardiac

pathology (Locke, p. 18 L. 10- 17), has no specialty in colon pathology (p. 98 L. 4 -L 6)

has no formal training in pharmacology since being a medical student in  1986  (Locke, p.

L.  5-10,  p. 7 L. 21- p. 8 L.2), had never done an autopsy on a person being infused with

anti-TNF drugs such as Remicade ( Locke, p. 20L. 9-18, p. 21 L. 4-8), did not take any

photographs during autopsy ( Locke,  p. 20, L 6-8).,   in over 7000 autopsies cannot think

of a single instance when he has opined that a  prescription drug caused or contributed to

the death of a patient ( Locke p. 22 L 6-17), did not include a clinical history in the

autopsy (Locke p. 26, L 1-3),  did not perform a microscopic examination of enlarged

lymph nodes (Locke p. 33 L 18- p. 34 L. 20), had done over 7000 autopsies and less than

four examinations of decedents with inflammatory bowel disease and never opined that a

patient died from intestinal bleeding while under a doctor's care, (Locke p. 35 l. 1 -12, P.

42 L. 1- 10), had no knowledge that Remicade ® had been associated with liver reactions

although there was a "Dear Doctor" letter from the manufacture in 2004 warning of

adverse reactions in patients related to the liver, did not take into consideration the

warning in examination of  Crystal Mack who had steatosis of the liver and had no

history of consumption of alcohol (Locke p. 35  L. 15- p. 37 L. 5 ), did not look at any of

the labeling information regarding Remicade during the autopsy ( p. 37 L. 6- p. 37 L. 9),

"didn't have a differential  for the fact that the spleen was congested" , although

Remicade ® had been associated with adverse events in patients(p. 37 L. 10-p. 38 L. 1),

did not have medical records indicating that Mack had abnormal blood loss ( p. 40 L. 12-

p. 40 L. 17), did not know how much blood loss Crystal Mack would have had to

experience over a given period of time to die of intestinal bleeding ( Locke p. 42 L. 11-

14), did not know how long Mack had been bleeding (p. 43 L. 10-12), "investigative

report does not say there was blood at the scene" by the office of the medical examiner

found no evidence that" there was blood in the toilet" as was asserted

by the defendants in their motion for summary judgment (p. 45 L. 3- 7), could not answer

the question as to how much blood loss from the body would be considered massive (p.

46 L. 1-6), doesn't know  when Mack went into shock as a result of blood loss although

he contends she suffered shock (Locke p. 47 L. 14-19), doesn't know when Mack

received a blood transfusion other than November "06 ( Locke p. 53 L. 6-13),  did not

speak to Dr. Pichney or Dr. Mancoll and does not recall speaking to any family members

of Crystal Mack (Locke p. 53 L. 14 19), didn't know the etiology

of Crohn's as he states" you wouldn't want to have any bleeding at all" and that he does

not know how much blood loss in abnormal in a Crohn's patient (Locke p. 53 L. 20- 54

L. 10), has no training in gastroenterology other than as a medical student and resident in

pathology (Locke p. 54 L. 11- p. 55 L. 2), did not know how much blood would

need to occur before Mack would have experienced ventricular fibrillation if

caused by blood loss (Locke p. 57 L. 4 - L 12),  did not order a metabolic screen

of the blood (Locke p. 58 L. 4-7), didn't see anything in the ambulance report that

would suggest a massive bleed or abnormal bleed ( Locke p. 60 L. 8-16), wasn't

aware that Remicade ® had been associated with v-fibs or that patients had

suffered v-fibs in the clinical studies (Locke p. 61 L. 11-16), doesn't recall on how

many occasions he has changed his opinion as to the cause of death of a medical

Examiner  (Locke p. 62 L. 1 -14),  cannot point to anything, to indicate what

Mack's blood count was to know whether she was hemorrhaging ( Locke p. 65 L. 22 -

p. 66 L. 3),  didn't place that diabetes was a contributing factor to Mack's death

on the autopsy report because it was in fact a factor as " in this case there was no

direct effect of the diabetes," (Locke p. 66 L. 4 - 21),  isn't aware of any literature that

would suggest that a Crohn's patient could die suddenly from a v-fib arrhythmia in

the absence of massive bleed, ".. that someone would die from, as you said, ventricular

fibrillation as a result of Crohn's, no. I'm not aware of any,  (Locke p. 68L. 14 p. 69 ),

did not document that Mack's intestine was full of blood in his autopsy although

testifying that he found , "her intestine is full of blood," and it was his practice to

document significant findings (Locke p. 71 L. 1-4),  did not see obvious well recognized

signs of gastrointestinal tract bleeding including hemoptyis "coughing up blood", or

"hematemesis "vomiting of blood" or melena "tar-like" appearance of the gastrointestinal

37

tract ( Locke p. 73 L. 12- p. 74 L. 4), did not test for tna-Alpha drugs in the body (p.76 L. 1-18), do not have any evidence that before Crystal Mack fainted on the date of the incident that she was having a bowel movement and that she pushed a significant amount of blood out of her intestine (Locke p. 82 L. 22 - p. 83 L. 4), did not know how long Mack had Crohn's or the stage of her disease (Locke p. 83 L. 15-20), did not identify any bleeding from any other source other than the colon (Locke p. 86 L. 3-6, p. 87 L. 2-14), does not know what percentage of blood volume would be required to be loss to cause the organ pallor that he saw in Crystal Mack (Locke p. 88 L. 1-4),  did not know what the clinical manifestations of the patient who experienced  the amount of blood loss would be to cause organ pallor ( Locke p. 89, L. 1-5),  did not find pooled blood in the rectum (Locke p. 90 L/ 18-21),  did not identify any areas of perforation in any portions of the Bowel (Locke p. 91, L- 15 -17),

Dr Locke states that differential diagnosis is used in forensic pathology ( Locke p. 13, L. 21, p. 14. L-1). "…we're essentially basing it on our objective findings, what we  see at our examination, the external examination and the internal examination of the individual, and, of course, whatever circumstances that surround the death, we take that  into account. (Locke, P. 14, L 7-11). The opinion reached by differential diagnosis is required to be held to a reasonable degree of medical certainty by a medical examiner based on Maryland State law  (Locke p. 14, L 13-20).

Dr. Locke did not consult with a forensic or cardiac pathologist in reaching his decision as to the cause of death of Crystal Mack (Locke p. 16, L 17- 19, p. 20 L. 2- 5).

Dr. Locke testified in deposition that Crystal Mack " was probably brought into our

office because of the fact that she was I guess an apparently healthy individual who was not expected to die." ( Locke p. 77 L. 3 -19 ).  Dr. Locke confirms that Mack was well-nourished, although she was small-framed ( Locke p. 27 L. 7-17), not anorexic ( Locke p. 95 L. 15-17), and there was no evidence of malnutrition (Locke p. 95 L-18-19).  Locke examination of Mack's bowel suggested that she had Crohn's disease.

Mack's death was not directly related to diabetes (p. 100 L. 11- 20).  There was no evidence that Crystal Mack suffered a pulmonary embolism (Locke p. 101 L. 12-14). Dr. Locke based his cause of death on organ pallor and the fact that Crystal Mack "intestines were filled with blood." There is no mention that her intestines were filled with blood in the autopsy. Dr. Locke does not eliminate that the pallor could have been a result of anemia on differential diagnosis as he did not know of Mack's clinical history and therefore attributed the pallor to a " tremendous amount of blood loss" which he did not quantify (Locke p. 79 L- 4- p. 80 L. 20,  p. 82 L. 15- 21).  Dr Locke testified:

> Q.  Okay. So the best recollection of what you found at autopsy would be contained in your typewritten report. Is that fair?
>
> A. Yes.
>
> Q. All right, And you indicate that, at least in today's deposition, quote, that her intestines were filled with blood, end quote. This is not a recollection you have. Is that true?
>
> A. That is correct.
>
> Q. And then the only portion of your autopsy report that discusses your findings of blood anywhere in the colon on page 1 where it reads , quote: There was blood per rectum and (sic) anal fissures on the left side measuring three-quarters of an inch, and then under the alimentary tract where you discuss other findings related to the bowel. Is that right?
>
> A. Yes.   ( Locke p. 86 L. 20 - p. 87 L. 14).

Dr. Locke testified that the autopsy reports are templated and that he just overrides the abnormal findings ( Locke p. 93 L. 3- 10, Autopsy of Mack).

Finally, Dr. Locke states that the bleeding Mack experienced would have passed through the rectum and would not have been absorbed by the bowel ( Locke p. 94 L 9- 11).

Locke shockingly further responded:

> Q. Did I hear you say that it would not affect your opinion in any way were you to learn that Ms. Mack in the preceding weeks and months to her death experienced little to no rectal Bleeding.
>
> A. No, it would not (Locke p. 98 L 19 p. 99 L. 1).

Dr. Locke's autopsy finding lack any reliability based on his qualifications, review of the case, knowledge of Remicade, and it nothing more than a leap to a conclusion that is not supported  by the clinical facts and events. Unfortunately, for the Defendants experts, Locke opinion based on legal and medical fallacy was embraced by them as the cause of death. Dr. Locke's evaluations is too nascent and tepid to support his conclusion. Dr. Locke does not have the skill, knowledge or experience to offer an opinion that will aid and his clinical and factual analysis is in  clear error. "The facts upon which an expert bases his opinion must permit reasonably accurate conclusions as distinguished from mere conjecture or guess. *Marshall V. Sellers,* 188 Md. 508, 518-19, 53 A.2d 5, 10

### *Dr. Marks*

While embracing Dr. Locke's theory of causation, the defendants attack Dr. Marks as unqualified and suggest that his general and specific theories as to causation do not survive Daubert. As fully addressed in  the **PLAINTIFFS'**

**OPPOSITION TO DEFENDANTS' MOTION IN LIMME TO EXCLUDE THE TESTIMONY OF JAMES T. O. DONNELL, PH.D. DONALD H MARKS AND WILLIAM L. MANION, M.D.** and **MOTION IN LIMINE TO EXCLUDE THE TESTIMONY OF DAVID SACHAR, M.D., RAYMOND M. CROSS, M.D., AND BARBARA MATHEWS, M.D.,** which are incorporated as though fully stated herein, Plaintiffs additionally addressed those contentions below in opposition.

Dr. Marks testified as to his qualifications in cardiology:

> A. Well, I'm not a cardiologist, but I have extensive training and experience in cardiology. I published a number of articles in journals of cardiology, some of which I brought with. And I routinely evaluate my own patients for cardiologic problems, and I order and interpret EKGs on those patients.

Dr. Marks testified about the clinical significance of the Lazernni study:

> A. But, at the same time, they said that new onset ventricular tachyarrhythmia, which is probably what—what I am hypothesizing happened to Mrs. Mack, had an eight percent incidence compared to two point seven percent incidence in the placebo with an odds ratonof three point one seven. So, there was a significant difference between the incidence of tachyarrythmias, ventricular tchyarrhythmias, between the infusion group and the placebo group during the infusion or immediately around the time of infusion..
>
> …………………………………………………….
>
> A So, there must have been a lot of patients that had this problem. I mean, not just one or two. They must have had quite a bit, because they're quoting two point seven percent of placebo. So, to get that kind of a number, two point seven percent, probably had a lot of people with tachyarrhythmia. Now, the kind—the ventricular tachyarrhythmia that they're talking about is really the kind of arrhythmia that can cause a problem, because this is the kind of arrhythmia that can turn fatal as opposed to sinus tachycardia, which you can get from anxiety or anemia or any other number of things. Tachyarrhythmias can be asymptomatic and they can propagate. **So, what I'm hypothesizing is that Crystal Mack developed a tachyarrhytmia, and developed a—and died from that. And that would be—that would pertain directly to this paper.**

41

*Specific Causation*

Remicade ® was in the body of Crystal Mack at the time of her death. Dr. Marks

testified:

> Q. And understanding that that there are, you know, variables to
> everything, isn't the convention that after five half lifes, the
> active ingredients in a medicine are out of the system?

> A. Well, that's true particularly for soluble drugs which do not- which
> are not bound to receptors. But in a case of 1 antibodies, as you know,
> the-there are two half lifes to consider. One is the half life characteristic
> of the—of the antibody itself, which is basically related to decomposition
> of the antibody and removal in the spleen and in the liver. And the second
> characteristic, which is that antibodies.
> ………………………………………………..

> Q. Okay, Now, we can agree that after eight weeks, Remicade
> is generally out of person's correct?

> A. Right. After eight weeks, which would have included Crystal Mack..

> ………………………………………………………

Dr. Marks is not a mouthpiece for counsel for the Plaintiffs.

> A. Well, the articles on arrhythmia are articles that I found. And the
> articles—they may have found them independently of me, but I
> found articles independently of them. I mean, I didn't rely on the
> counsel to provide me with articles on arrhythmia from Remicade.
> I did my own search.
> ………………………………...............................
> Q. Now, counsel has spoke largely about the records. Now, let me ask
> you this question, Doctor: When you first got
> this case, do you receive the medical records?

> A. Yes.

> Q. Did you receive the medical records? And did
> you advise counsel what your opinions were before
> anything was written?

> A. Before anything was written, I did. I told you    what my opinions were.

42

Dr. Marks performed a differential diagnosis and ruled out pulmonary embolism.

Q. So, we also known, or can you tell me, did crystal Mack experience a pulmonary embolism? A, No. Q. Okay. And a pulmonary embolism can be fatal, correct ?A. Correct.

Dr. Locke also stated that there was no evidence that Crystal Mack suffered a

pulmonary embolism.

Dr. Marks rules out intestinal bleeding and anemia in disagreeing with the autopsy

findings of Dr. Locke who is not a clinician and not board certified in any field of

medicine:

Q. And you disagree with the conclusion because why? A. Well, because in my experience because in my experience, as is the experience of the treating physician, patients that have some chronic anemia and also some chronic bleeding, if their anemia and bleeding is going to lead to death, then, they're going to have extreme fatigue, pallor of the mucous membrane, shortness of breath, or exertion, possibly Chest pain, fainting. And Crystal Mack really didn't have these. She had some—she had chronic anemia form a chronic continuous anemia from a chronic continuous bleeding from her intestinal tract, as is indicated by the fact that she had commented that she had some bleeding. Bleeding—blood was found on her- in her buttock area. And on pathologic exam, gross and pathologic, there was some intestinal hemorrhage, which is what you would expect to see in a patient with Chron's disease. But you know, she was awake. And then, she immediately had a sudden onset of loss of consciousness, shortly regained her consciousness, and then, was-went into her death throes. So, this is More consistent with the presentation of an arrhythmia. Also because if someone develops shortness of breath and chest pains from hypoxia, they often have angina. She didn't experience any angina as far as anyone could tell either before her first episode of loss of conscious--

THE WITNESS: Am I talking too fast?

A. – or after her second or after her final episode of loss of consciousness. So, really I doubt that she had—that hypoxia or anemia was responsible for this. I think that she did have some chronic low-grade intestinal hemorrhage, as you would see with someone that had Crohn's  disease…

……………………………………………………………………….

A.--…But she had a sudden loss of consciousness. And that is really consistent with an arrhythmia. Sp, whatever we posit for the cause of the arrhythmia, I

43

think that arrhythmia, I think that arrhythmia was her actual cause of death…

Dr. Marks rules out anorexia and electrolyte disturbances:

Q. In fact, you've looked at the records where there
clearly  are indications that people believed she
was anorexic, right?
………………………………...............

A.   Right. But I don't think that her body mass had
cause for arrhythmias. I mean—and I don't think that
her electrolyte disturbances were that that strong…

Dr. Marks rules out stroke and heart attack:

A. Well, I—as I mentioned earlier, the differential diagnosis is stroke, heart
attack, or lethal arrhythmia or pulmonary embolism. And there was not a
stroke on the autopsy, there was not  a stroke on the autopsy, as we covered in
detail a few minutes ago. There was no evidence of a heart attack on the
autopsy. Meaning, there was no infract of tissue and there were no blocked
coronary arteries that left the lethal arrhythmia. And also that is bolstered by
the fact that the person had ventricular fibrillation at the –at the lethal—at the
time of death.

Dr. Marks rules out a massive bleed while ruling in and out other conditions.

Q. Okay, Did you rule in Crohn's?   A. Yes. Q. Did you rule in her diabetic
condition   A. Yes. Q. Did you rule in her anemia? A. Yes. Q. Did you rule in her low
weight? A. Yes. Q. Did you rule in a possible pulmonary embolism? A. Well, I mean,
it-- I  didn't rule it in because,  at that point, I knew she didn't have it. Q. Okay, did
you rule in congestive heart failure? A. Well, I considered it, but I also knew that by
her autopsy results, she didn't have it. Q. Did you rule in a massive bleed? A. Yes
Q. Did you see any evidence of a massive bleed? A. No, I saw evidence of a
continued low-grade bleed, which was--which was exhibited both by   history of the
patient and also findings on the autopsy that she a chronic condition, part one--
Of-- the characteristic of which is low-grade  gastrointestinal bleeding, which she
did not have a  massive bleed. And, in fact, one of the articles  I brought with today,
which was never discussed, was a review of-- and I think Dr. Socier was cier
was one of the authors on that--was a review of fifteen hundred or so patients that
had Crohn's disease. And they looked back to see how many had a severe
gastrointestinal bleed. And it was--it  was very rare, even in Crohn's disease.
Q. Now, could you tell the members of the jury  what a massive bleed is? Is that
just like a woman having a period or is it something more? A. A massive bleed is one
that--in which there's a  compromise of the cardiovascular system, such that  the loss

44

of volume results in an inability to maintain blood pressure. Q. Okay. Do you see--did you read the deposition of
   Lisa S. Pichney?

A. Yes.

Q. Did you see the language in the deposition where she said it was never reported to her that there was a massive bleed?

A. Yes.

Q. Okay. Did you see anything in the facts that would suggest to you that there was a massive bleed? Do you see any indications in the ambulance records or when she arrived at the hospital or anything?

A. No, she didn't have a massive bleed. She had chronic low-grade bleed that was--had been ongoing for some time. It was due to her Crohn's disease, which was responded to-- which was necessitated and responded to intermittent transfusions of blood.

Q. Did you see anything in the literature where a person dies from Crohn's disease from a low-grade bleed?

A. No.

Q. Are you aware, in your clinical experience, of a Person dying from Crohn's disease from a low-grade bleed?

A. No. a person could not die from Crohn's from a low-grade bleed?

Q. If a person were dying from a low-grade bleed, would they go unconscious, wake back up, talk to People, and then, immediately go out and die--

MR. WINTER: Object to the form of that question.

Q. (BY MR. HUSKEY)-- as is suggested in this case?

A. No.

**Q. So, after ruling in all of the possible things that could have caused or contributed to the V-fib that was experienced by this patient, did you, then, rule certain things out?**

**A. Yes.**

**Q. And what did you rule out?**

**A. Well, I ruled out pulmonary embolism. I ruled out massive bleed leading to hypotension. I ruled out congestive heart failure. And that left me with hypoxia from anemia and electrolyte disturbances was the principle causes along with Remicade. And the reason I included Remicade was because the reports I found in the medical literature and in FDA adverse events reports of arrhythmias being associated with Remicade and the fact the she died of an--with an arrhythmia, which is, of course, you know she died.**

        …………………………………………………………………………

Q. And did you see in support for Dr. Sakor's belief that this was caused by a bleed?

MR. WINTER: Object to the form of the question.
Q. (BY MR. HUSKEY) A massive bleed.

A. I didn't see any support of it because I and also the treating physician saw no evidence of a massive bleed. Also, the autopsy report did not document a massive bleed. And the patient's family never documented that there was blood all over the floor or that there was blood in the toilet after a bowel movement or there was bright red blood all over a bed or that the person bled in ambulance on the way to the emergency room. There was no-- there was no sign anywhere of massive bleed. She didn't throw up a lot. She didn't have a--she didn't have blood in her urine. She wasn't coughing up blood. And she didn't have any visible signs of easy bruising or bleeding on her body. So, I don't see any evidence of a massive bleed.

Q. So, as to Dr. Sakor, so you would disagree with him, right?

A. Yes.

Q. Now, as to Dr. Matthews, who also opined that she believed that it was due to anemia and bleeding, do you disagree with her?

A. Well, I think that the anemia--that the bleeding--there was low level chronic

46

bleeding. And, you
Know, it is distributing to see someone have blood in their stool and even on the
thighs of someone or in the buttock area. But, you know, when you have low-
grade grade bleeding, whether it's from Crohn's disease or ulcerative colitis or
hemorrhoids, external hemorrhoids, and you have a patient or even a family
member that has external hemorrhage, you're going to see blood in their
underwear. And also women that have heavy periods, sometimes they're going
to--they have blood. They soil their clothes or have blood in their inner thighs
from the bleeding. Women that hemorrhagic cystitis, which is a bladder
condition, have this bleeding. So, bleeding itself is a normal part of life. And
it's-- and it doesn't indicate massive bleeding. Sometimes when people see
blood, they say, oh, blood, you know, this person's going to die from bleeding.
But this case, everyone knew this patient had chronic low-grade bleeding,
because she had Crohn's disease. Everybody knew that. So, there was-- and
nobody said that she had anything more than her usual state of bleeding. And
the autopsy didn't document massive bleeding. And the autopsy didn't say her
colon was filled with fresh blood and blood clots. It said that there was evidence
of infracts and hemorrhage--hemorrhagic sites in the mucosa of the colon.
That's normal for Crohn's disease. That's her normal disease state.

Dr. Marks reviews all conditions that Crystal Mack was experiencing and concludes

that Remicade® caused or contributed to her death.

Q. Understanding that answer, understanding that answer, but am right that you
have a patient who's predisposed to an arrhythmia because she's got the
intestinal bleeding, an electrolyte imbalance, very low body weight, and
hypoxia, and that Remicade fifty-five days after it was infused precipitated this
event.

A. I think that Remicade was the final factor that threw her over the edge.
Because, certainly, she had all those other factors. But none of those factors in
themselves seem to have been enough to throw her over the edge, because she
had them for quite some time. Remember, she had anemia persistent anemia
requiring transfusions. She had long-term electrolytes abnormalities. But she
never developed ventricular fibrillation and died. The only big difference was
that while Remicade was still in her body, as discussed in the prescribing
information and the literature from the company, that Remicade is present up to
that time period of fifty to fifty-five days because of its half life and because
they describe when the dosing is to begin and when the Remicade runs out, the
only—the only other inciting factor that was present that could have tipped her
over the edge was the Remicade. Everything else was constant in her. She
always had the anemia. She always had the low level of hypoxia secondary to
anemia. She was certainly running around low electrolyte or some electrolyte
abnormality just by the very fact that she had chronic diarrhea and she was

47



bleeding she had all sorts of other problems. She had malnutrition. She had low weight. So, all of those things were constant. The only thing to change was, she got the Remicade.

……………………………………………………..

…But I'm saying that more likely than not, Remicade contributed to the death of Crystal Mack.

……………………………………………………..

Q. Okay. And in considering—did you a differential diagnosis as the—as the cause mote likely than not of Crystal Mack's V-fib cardiac arrest?

A.   Yes.

…………………………………………………….

Dr. Marks holds his opinions to a reasonable degree of

medical certainty:

EXAMINATION BY MR. HUSKEY:

Q. Doctor, I have a few questions. Now, your rebuttal report, your rebuttal report, your supplement the report, and your expert report, do you have—do you hold the opinions that you've stated in those reports to a reasonable degree of medical certainty—

Despite the exhaustive analysis by Dr. Marks as to general and specific causation, the Defendants contend that  the Plaintiffs have failed to provide a mechanism by which it is scientifically and biologically plausible for Remicade® to cause arrhythmias, therefore their opinions regarding general causation are fatal.

In *McClain v. Metabolife Intern, Inc.,* cited for the proposition that plaintiffs' expert cannot testify to any biological plausible explanation for their general causation, the experts were not able to establish a dose-relationship, there was no support in the medical literature for their theory, no support for increased risk, no clinical trials and no animal trials. In the instant action plaintiffs experts have referred to the labeling for Remicade related to arrhythmias, a post-marketing clinical trial where patients suffered arrhythmias, a dose-relationship, pre-marketing clinical trials where patients suffered

arrhythmias, adverse reports, case reports, and as to specific causation where Crystal Mack suffered a fatal arrhythmia that was caused or contributed to by Remicade to a reasonable degree of medical certainty. As stated above, Crohn's disease was eliminated as the cause of the arrhythmia as it did not occur as a result of chronic massive bleeding. *See* Plaintiffs' Opposition to Defendants' Motion *In Limine* to Exclude Experts.

Dr. Mark's reliance on other arrhythmias suffered by Remicade patients is admissible to prove notice of the defect. Under Maryland law, evidence of prior claims is admissible to prove notice of a defect, the existence of a defect, the dangerousness of a defect and the causal relationship between the defect and the injuries claimed. *Locke, Inc. v. Sonnenleiter,* 208 Md. 443, 451, 118 A. 2d 509 (1955). Proof of substantial similarity- not identity- is required. Id. At 451-52.

### *Dr. William L. Manion*

Dr. William Manion holds a MD, PHD, JD, MBA, and is board certified in anatomic, pathology, and forensic pathology. Dr. Manion has published regarding pulmonary embolism. William L. Manion . Dr. Manion has reviewed the opinions of Dr. Marks and Dr. O'Donnell who had opined as to general and specific causation for the death of Crystal Mack. Dr. Manion is permitted to rely on the opinions of other experts in forming his opinions.     Dr Manion reached the conclusion based on his review of documents including the clinical records and the autopsy  of Crystal Mack. Dr. Manion also conducted research regarding death's in Crohn's patients. Manion opined that Crystal Mack did not die of intestinal bleeding due to the following reasons:

> 1. There was no bleeding or collection of blood in the large bowel.
> 2. Manion's experience as a medical examiner for over 22 years and performing dozens of autopsies on  patients who had died of Crohn's disease  or other inflammatory bowel disease had not personally seen massive hemorrhage as a cause of death.
> 3. The circumstances regarding her death do not disclose significant  Hemorrhage.
> 4. No death in the medical literature ascribed death to hemorrhage of the gastrointestinal tract without "massive bleeding."

49

5. Cystal Mack's death was more consistent with a sudden cardiac arrest precipitated by an arrhythmia.

6. Manion was not aware of any patient who died from bleeding who fainted and then quickly regained consciousness which is a classic sign of arrhythmia. (Exhibit 32, Manion Expert and Rebuttal Reports, C.V.)

*James T. O'Donnell*

With respect to Defendants' argument regarding James O'Donnell's general causation theory, Plaintiffs have addressed this matter in *Plaintiffs' Opposition to Defendants' Motion In Limine To Exclude Plaintiff's Experts* and are incorporated as if fully set forth herein.

*Independent Proof of General Causation*

Defendants in their labeling dated December 2006 recognized the general causation associated with arrhythmia and heart failure for the drug Remicade with no explanation as to the biological reasons for the medical guidance. In part, the labeling reads:

" REMICADE has been associated with adverse outcomes in patients with heart failure, and should be used in patients with heart failure only after consideration of other treatment options. ..There have been post-marketing reports of worsening heart failure, with or without identifiable precipitating factors, in patients taking REMICADE. There have also been rare post-marketing reports of new onset heart failure, including heart failure in patients without known pre-existing cardiovascular disease. Some of the patients have been under 50 years of age…" (CAM 00000317)

"Crohn's disease- In a study where 47 of 41 patients with Crohn's disease with infliximab following a 2 to 4 year period without infliximab treatment, 10 patients experienced adverse events manifesting 3 to 12 days following infusion of which 6 were considered serious…" (CAM 00000321)

"Adverse Reactions in Pediatric Crohn's Disease- The following adverse events were reported more commonly in 103 randomized pediatric Crohn's patients ….anemia (11%)…"(CAM 00000323)

50

"…Others serious, medically relevant adverse events $\geq$ 2% or clinically significant adverse events by body system were as follows …*Heart Rate and Rhythm: arrhythmia, bradycardia, cardiac arrest, tachycardia. Red Blood Cell: anemia, hemolytic anemia*" *(CAM 0000325)*

The defendants contend in their motion that there has been a request to the FDA to remove the warning regarding arrhythmia. The Plaintiffs can find no case law which would suggest that a court has, should, or can recognize  in a lawsuit an affidavit regarding a request to an administrative agency to remove a warning related and materially relevant as to general causation in a lawsuit.

"Administration instructions regarding infusion reactions-…Approximately 20% of REMICADE -treated patients in all clinical trials experienced infusion reaction compared with 10% of placebo-treated patients." (CAM 00000327).

The May 2006 Labeling by Centocor also recognized the general causation for arrhythmias as stated in the December 2006 labeling (Exhibit   ).

Arrhythmic Risk During Acute Infusion of Infliximab: A Prospective, Single-blind, Placebo-Controlled, Crossover Study In Patients with Chronic Arthritis by Pietro Enea Lazzerini, etc.

The Lazzerini clinical study is the first attempt to review the arrhythmias experienced by patients receiving Remicade ® therapy. Highlights of  this powerful proof that Remicade ®  causes ventricular arrhythmias as experienced by Crystal Mack after 4 infusions:

1. "During IFX infusion, new-onset ventricular tachyarrhythmias had an incident an 8% incidence (2.7 with placebo, OR 3.17, 95% CI 0.61--16.26) were severe."
2. "…Recent reports suggest that IFX may be associated with the onset of  potentially life-threatening cardiac rhythm disorders. De'Clari, et al  described a case of sudden death 18 hrs after a single infusion of IFX In a 64-year old patient with RA without chronic hear failure., in which post-mortem examination did not provide an organic cause of death.  Boyer et al reported an episode of hemodymically unstable

ventricular tachycardia in a 50 year-old patient with SpA, 24 h after the ninth infusion The occurrence of bradyarrhythmias has also been reported.  A 22 year-old man with ulcerative colitis showed symptomatic sinus bradycardia (39 beats/min) requiring repeated atopine injections 1 hr after IFX administration…Consider together, these data make conceivable  the hypothesis that IFX may exert proarrhythmic activities dependent  on an indirect effect of alterations in cardiac inotroposna and/or coronary flow, or a direct interference effect on the drug on the myocardial electrophysiology. Accordingly, abnormalities in the QT interval dispersion have been reported in a preliminary study performed on 11 children with inflammatory bowel disease receiving IFX. …\

On the basis of these considerations and because patients with RA and SpA present an intrinsic higher risk of developing arrhythmias ad sudden death  with respect to the general population…"

3. "The path physiological plausibility of our results is related to the data that both prolongation of Qtc and HRV impairment are risk actors for development of life-threatening arrhythmias and sudden death…"

4. "Occurrence of these cases in young patients and absence of preexisting cardiac disability and their prompt spontaneous or atrophine induced recovery, suggest functional interference in the conducting system of the heart. Thus the IFX- associated relative vagal hyportonia we observed might account for the onset of bradyarrhythmias in predisposed subjects. (Lazzerini study attached)

Johnson & Johnson post-marketing reports shows that patients have

experienced 102 documented arrhythmia, 310 documented atrial fibrillation, 23

documented ventricular fibrillation, and 37 documented events of ventricular

tachycardia (CAM 2319)..

National, Heart, Lung, and Blood Institute Study
"Drug-induced sudden cardiac death 9also called sudden death, SD) and ventricular arrhythmia (VA) has risen as major public health concern in the last decade. Sudden death/ventricular arrhythmias have resulted in the withdrawal of more drugs in recent years than any other drug reaction, and the identification of over 100 non-cardiac drug as suspected of being high risk.(Exhibit 47).

**IV.    Conclusion**

52

Based on the reasons set forth in the foregoing memorandum, Defendants' Motion shall be denied

Respectfully submitted,

_____/s/_____

Donald R. Huskey (Bar No. 22981)
Law Offices of Donald R. Huskey LLC
1023 North Calvert Street 3rd Floor
Baltimore, Maryland 21202
(410) 347-7979

_____/s/_____

Governor E. Jackson, III (Bar No. 27673)
Law Offices of Governor E. Jackson, III, LLC
1023 North Calvert Street, 4th Floor
Baltimore, Maryland 21202
(410) 528-5150
(410) 528-1055 (f)

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this ___15th___ day of June 2009, a copy of the

foregoing Memorandum of Law In Support of Plaintiffs' Opposition to Defendants'

Motion for Summary Judgment was electronically mailed to the following Attorneys for

the Defendants: Terrence M.R. Zic, Esq., William Robinson, Esq., LeClairRyan, 225

Reinekers Lane, Suite 700, Alexandria, Virginia 22314, John Winter, Esq., John D.

Winter, Patterson Belknap Webb & Tyler LLP, 1133 Avenue of the Americas, New

York, New York 10036.

_____/s/_____

Donald R. Huskey
